SOCIÉTÉ VINICOLE DE CHAMPAGNE v.
MUMM CHAMPAGNE & IMPORTA-
TION CO., Inc.

District Court, S. D. New York.
Dec. 31, 1935.

576

C. P. Goepel, of New York City, for plaintiff.

Wayne Johnson, of New York City (Mark J. Ryan, of New York City, of counsel), for. defendant.

WOOLSEY, District Judge.

My decision herein is in favor of the plaintiff, which will have an interlocutory decree carrying costs and giving the relief hereinafter indicated.

I. This cause, which involves questions of infringement of trade-mark and of unfair competition, is now before me on final hearing.

The subject-matter jurisdiction of, this court herein is based, in so far as questions of trade-mark are involved, on the Trade Mark Act, § 17, title 15, United States Code, § 97 (15 U.S.C.A. § 97), and, in so far as questions of unfair competition are involved, on the fact that it involves far more than the jurisdictional amount of $3,000, exclusive of interest and costs, and that the plaintiff is a corporation organized and existing under the laws of the French Republic and the defendant is a corporation organized and existing under the laws of the. state of New York. Title 28, United States Code, § 41, subd. 1 (c) (28 U.S.C.A. § 41 (1) (c).

II. The plaintiff's bill of complaint filed on January 30, 1934, asks for the injunctive relief customary in cases of this kind, especially emphasizing the prevention (1) of the defendant's use of the names "The Mumm Champagne & Importation Company, Inc.," "Mumm," "Mumm's," and "Mumm & Company" as being an infringement of the plaintiff's trade-name and trade-marks; and (2) of unfair competition with the plaintiff in the sale of champagne wines.

III. The .cause first came before me in connection with motions to strike out certain affirmative defenses and a counterclaim pleaded by the defendant in its answer.

The counterclaim and all the affirmative defenses were stricken out except the fourth, in respect of which the defendant was given leave to amend so as to allege what is the true name of its leading incorporator—referred to throughout said defense as Walther von Mumm. Société Vinicole De Champagne v. Mumm Champagne & Importation Company (D.C.) 10 F.Supp. 289.

The defendant filed its amendment to the fourth affirmative defense, but did not conform properly to the order which I had made, and a motion was then made by the plaintiff to strike out this amendment to the answer. This motion was granted by Judge Bondy with leave again to amend.

The defendant then filed its finally amended fourth affirmative defense stating under oath inter alia that the true name of the incorporator of the Mumm Champagne & Importation Company was Walther von Mumm.

This defense, in so far as it needs to be here quoted, is as follows:

"The defendant herein was organized under the laws of New York on or about September 29, 1933, by Walther von Mumm, Carl M. J. von Zielinski and Guy H. Lippitt, incorporators, with an outstanding and paid up capital of one hundred shares, which are owned as follows: By Walther von Mumm seventy shares; in escrow for Sidney Sugerman, thirty shares. The officers of the defendant are as follows: Walther von Mumm, president; G. H. von Mumm (nephew of

Walther von Mumm), vice president; James W. Thornton, vice president and secretary; Carl M. J. von Zielinski, treasurer. The defendant's president, Walther von Mumm, is the principal actor in its business and daily gives his time and attention thereto to the exclusion of all other business. Said Walther von Mumm is a direct descendant of the founder of the original G. H. Mumm & Co. and has been engaged in the business of manufacturing and selling champagne wines for more than twenty-five years, except for interruption caused by the World War. Said Walther von Mumm is not in any sense a figurehead or dummy officer or director of the defendant, and the use of his name in defendant's corporate name is to give public notice of his association and employment with and by the defendant. * * * Defendant is the exclusive agent in the United States to sell champagne wines made or selected by or under the direction of any member of the Mumm family. All of said champagne wine sold by it was manufactured or selected by some member of the Mumm family skilled in the art of manufacturing or selecting high grade champagne wines. The champagne wines sold by defendant are plainly and clearly marked and labelled in a manner totally different from the manner in which the champagne wines sold by plaintiff are marked and labelled. * * * The consuming public has not confused and will not confuse the markings and labels on plaintiff's goods with the markings and labels on defendant's goods.

"The true name of Walther von Mumm —the person referred to in this defense as such, is Walther von Mumm."

There was a supplementary bill of complaint filed after my decision above referred to on motion to strike out the separate affirmative defenses, so that the cause has come on for trial on the allegations of the complaint, the denials thereof, and the affirmative defense just set forth.

IV. After the issues were thus framed, the plaintiff filed a motion for a preliminary injunction which was granted by Judge Hulbert. Société Vinicole De Champagne v. Mumm Champagne & Importation Company, Inc. (D.C.) 11 F.Supp. 208.

The preliminary injunction order restrained inter alia the defendant in the sale or distribution of champagne or sparkling wines or the like, excepting champagne wines having their origin in plaintiff, from using the name "The Mumm Champagne & Importation Company, Inc.," and from using the name "Mumm" or any name which includes the word "Mumm" or any colorable imitation thereof, excepting therefrom as a proper restriction pending the trial of the cause the use of one of two definitely restricted names, i. e., "W. v. Mumm Wine Co., Inc.," or "Walther Mumm Importing Co. of New York, Inc.," having throughout characters of uniform style and size, save the second character "v," the use of the name chosen by defendant to be always immediately followed by the phrase "Not connected with Société Vinicole de Champagne (Successor to G. H. Mumm & Co.)," in characters definitely defined and of one-half the size of the characters in which the word "Mumm" is printed as part of the chosen name.

As a further proper restriction, defendant was enjoined from issuing, etc., any advertisements, circulars, catalogues, or handbills without having inserted thereon in a conspicuous position a prescribed "Notice" defining the relations of the parties.

Upon the interlocutory motion for preliminary injunction, Judge Hulbert did not find it necessary to decide what is the true name of the defendant's principal incorporator.

There was not any appeal taken from the preliminary injunction.

All the questions involved in this cause have been dealt with at the trial at great length, and there have resulted certain changes in the facts from what I understood them to be on the above-mentioned motion to strike out defenses. These changes will be the subject of comment hereinafter.

V. I find the facts in this cause as follows:

1. Under the heading "Mumm von Schwarzenstein" in the Almanach de Gotha, which is the recognized genealogical reference book for the Prussian and other German nobility, cf. Edition of 1901, are listed the ancestors of the witnesses Hermann and Walther Mumm von Schwarzenstein who have testified in this cause, and who will be hereinafter referred to merely for convenience of nomenclature as

"Mumm," the appellation by which they are in most relations in life usually known.

It appears from the said Almanach de Gotha that the family of Mumm von Schwarzenstein belonged to the ancient nobility of Cleves, a town in Rhenish Prussia situate not far from the Rhine, and principally known to English speaking folk as the birthplace of Anne of Cleves, the fourth wife of Henry VIII.

The Mumm family is traceable as far back as 1359, and it appears that there were the changes characteristic of early and somewhat unlettered times in the spelling of the name, as, for instance, it is found as Mom, Momme, Mumme, and Mumm.

In 1514 Rudolph Mumm or Mom purchased the estate of Schwarzenstein from a family which seem to have been called Amelong, and his son was known as Bernd or Berndz von Schwarzenstein.

In the early nineteenth century one part of the family, referred to in the Almanach de Gotha as "The Third Line," turned its attention to wine making.

Gottlieb Mumm, born in Solingen, February 6, 1781, founded in 1822 the *Johannesberger Estate*, and in 1827 at Reims, France, the champagne house which later became known as G. H. Mumm & Co.

Gottlieb's son, called in the Almanach de Gotha, Jacob Georg Hermann Mumm von Schwarzenstein, because of the renewal of his Prussian nobility in 1873 as hereinafter shown, was born in Frankfort on November 23, 1816, and is the grandfather of the witnesses in this case whom I am calling for convenience Hermann and Walther Mumm, and whose father, Peter Arnold Gottlieb Hermann, born at Frankfort September 29, 1842, was head of G. H. Mumm & Co. in his turn until Hermann Mumm succeeded him.

2. In 1854 the firm of G. H. Mumm & Co. was organized at Reims, France, by the aforesaid Jacob Georg Hermann Mumm under the laws of France as a *société en nom collectif,* with members of the Mumm family as a preponderating majority of the beneficial owners thereof.

3. In 1854 a label of said firm, showing an anchor with the word "Original" above it and the words "G. H. Mumm & Co., Reims," in curved form below its flukes, and below those words the word "Champagne" in much smaller type, was entered, according to the act of Congress then in force, in the clerk's office of the District Court of the United States for the Southern District of New York.

4. On March 31, 1873, William the First, German Emperor and King of Prussia, granted a patent of nobility to the Mumm family, which, translated, reads as follows:

"We, Wilhelm, announce that as the Royal Danish Consul and head of the merchant wholesale house, Jacob Georg Hermann Mumm has proved his descent from the noble family of Mumm von Schwarzenstein, that we renew their nobility for himself as well as for the present and future direct descendants of both sexes.

"We, therefore, bestow on you and on your all beforementioned descendants all the rights, honors and privileges of the descendible nobility, specifically the right to call yourself von, namely, Mumm von Schwarzenstein."

5. On May 30, 1883, in the Official Gazette of the German Empire and of Prussia, there was the following announcement:

"His Majesty the King is pleased to grant the title of Purveyors to the Royal Court to the merchants Peter Hermann Mumm von Schwarzenstein and Max von Guita of Frankfort a' Main, Germany, proprietors of the firm of Peter Arnold Mumm of Frankfort a' Main, Germany, and co-partner of G. H. Mumm & Cie., of France."

6. United States certificates of trade mark registration Nos. 3,984, of September 12, 1876, 4,473, of March 20, 1877, 8,638, of September 13, 1881, 9,837, of November 21, 1882, 10,513, of August 14, 1883, were issued to said firm on the dates named. All these showed as part of the marks the name of "G. H. Mumm & Co."

7. From shortly after 1906 and until the events hereinafter mentioned, all the beneficial ownership of G. H. Mumm & Co. was in members of the Mumm family; the partners in the firm being (names abbreviated for convenience) Hermann Mumm and Mme. Emma Passavant Mumm, widow of Peter Mumm, and from January 1, 1913, Walther Mumm.

8. United States certificates of registration of trade-marks were filed on the dates indicated: No. 51,869, on April 24,

1906; No. 55,641, on August 21, 1906; No. 55,642, on August 21, 1906; No. 55,-643, on August 21, 1906; No. 58,835, on December 25, 1906.

9. G. H. Mumm & Co., which was always domiciled at Reims, France, used, when they exported wines from France into the United States, on their labels the above trade-marks which were owned and registered by them in France and registered by them also as owners in the Patent Office of the United States.

10. At least from 1891 to the times hereinafter mentioned Frederick de Bary & Co. of New York were the sales agents of G. H. Mumm & Co. and the distributors of their wines throughout the United States, where they were sold on consignment under the trade-marks above mentioned.

11. On January 1, 1911, a corporation of New York, called the Mumm Champagne & Importation Company, Inc., precisely the same name as that of the defendant herein before it was changed in pursuance of Judge Hulbert's decision on the preliminary injunction, was formed by G. H. Mumm & Co., and this corporation, which will be called hereinafter the First Agency Corporation, took over the De Bary sales agency business in Mumm wines and continued it as before, selling on consignment champagne bottled in the Reims district of France and marked with the Mumm trade-marks aforesaid.

12. On December 28, 1914, after the European war had begun, the French government appointed a sequestrator, who sequestrated and attached all the properties in France of every nature and kind of G. H. Mumm & Co. and Hermann Mumm. A further order of January 6, 1915, of the President of the Tribunal of First Instance of Reims, seized the property in France of Hermann Mumm, Walther Mumm, and the Widow Passavant Mumm.

13. On August 11, 1919, the Constitution of the German Federation, which is commonly referred to as the Weimar Constitution, was adopted. Provision 109 thereof reads as follows: "Public privileges or disadvantages of birth or status are to be abolished. Marks of nobility are considered only as part of the name and shall not be granted any more."

14. On March 17, 1920, the President of the Tribunal of First Instance at Reims ordered the liquidation of the property of G. H. Mumm & Co. which had been seized, and on June 19, 1920, appointed liquidators therefor, and ordered the liquidators "to assure the execution under the terms of the conditions of sale of all provisions therein contained."

15. The First Agency Corporation, owned by said firm of G. H. Mumm & Co., was seized as an enemy owned corporation by the Alien Property Custodian of the United States, and on November 24, 1919, the First Agency Corporation was dissolved by the Alien Property Custodian of the United States and thenceforth entirely disappears from the situation, except as the suggestion of a name for the defendant.

16. On August 11, 1920, the liquidators reported to the President of the Tribunal of First Instance at Reims that the public sale of the properties of the firm of G. H. Mumm & Co. had taken place on July 28, 1920.

This sale by its terms covered all the seized assets of the said firm, that is, all the vineyards, and all other real estate, including the premises where the firm headquarters were then situated at No. 29 rue de Champ de Mars, Reims, France, the customers and good will of the business of the firm, all the trade-marks of the firm, the material and equipment intended for the operation of the business, and the merchandise on hand.

17. On August 17, 1920, the sale of the G. H. Mumm & Co. properties to the plaintiff—a corporation existing under and by virtue of the laws of France—was duly confirmed and recorded in the office of the clerk of the court of the First Instance at Reims.

18. On September 9, 1920, the French liquidator, in pursuance of the powers in him vested, confirmed the transfer to the plaintiff herein of all the right, title, and interest of G. H. Mumm & Co. in trademarks which were owned and registered by G. H. Mumm & Co. in France and registered by it as owner thereof in the United States.

19. On October 24, 1921, the Mixed Tribunal rendered a unanimous decision in a litigation which had been initiated by the plaintiff against the persons who were the partners in G. H. Mumm & Co. at the time of the seizure and liquidation thereof.

The title of this proceeding was: Plaintiff: Société Vinicole de Champagne. De-

fendants: Hermann de Mumm of Vitzneu, Switzerland; Walther de Mumm of Frankfort sur Main, Germany; Widow Emma de Mumm (née Passavant) of Frankfort sur Main, Germany.

The three defendants were sued as individuals and in their capacity as partners of G. H. Mumm & Cie.

An agreed summary of this proceeding, showing the issues raised and the determination of the Tribunal thereon, is as follows:

"The application of the plaintiff prayed:

"That the Tribunal declare the plaintiff to be the sole owner of the trademarks which belonged to G. H. Mumm & Cie.; that plaintiff alone should be entitled to use the trade-marks in all countries where the same had been registered; and further be entitled to effect registration of the trade-marks in all countries where such registration had not yet taken place.

"That the Tribunal order the defendants, jointly and severally, to pay damages to the plaintiff to the amount of a million francs per month from August 27, 1921, up until date of judgment.

"That the Tribunal order the defendants to pay to the plaintiff one million francs per month from the date of the judgment up until the date on which every infringement of plaintiff's rights has ceased; and also that the Tribunal shall order the defendants to pay all costs of litigation.

"The court held on the facts:

"(a) That defendants, German citizens, had constituted in Reims under the name of G. H. Mumm & Cie, a *société en nom collectif* for conducting business in champagne wines.

"(b) That by court order of the president of the Civil Tribunal of Reims, dated December 28, 1914, directed against the German firm Mumm & Co., the entire property of said firm, its real property, merchandise, movable property, securities, accounts receivable, at Reims and at the branch establishments of the firm in France, were sequestrated.

"(c) That by court orders dated March 17 and June 19, 1920, respectively, the president of the Civil Tribunal of Reims, ordered the liquidation of property rights and interest of every kind and nature belonging to G. H. Mumm & Cie. and which were subjected to war sequestration.

"(d) That according to the sales specifications established by the liquidators the movable property which had to be liquidated were the following: 'good-will of the champagne business which had been carried on at Reims and comprised the following items—the clientele (custom), the equipment belonging to the business, the merchandise and the rights to the trade-marks.'

"(e) That the plaintiff acquired in its own name all the property under the liquidation.

"The defendants contended:

"(f) That the trade-marks registered by G. H. Mumm & Cie. in foreign countries were not included in the liquidation which had taken place in France and that the defendants have therefore served on the plaintiff a defense threatening damage claims for the use of the trade-marks G. H. Mumm & Cie., the Jules Mumm mark, and especially on corks and labels, the marks Cordon Rouge, Cordon Vert, in all countries of the world with the exception of France, her colonies, possessions and protectorates; that the defendants intended themselves to exploit those marks or had reserved to themselves the right to assign the same and the labels to third parties, contending that in so far as M. Hermann de Mumm is concerned the trade-mark G. H. Mumm & Cie. was at the same time his patronymic name.

"(g) That defendants had registered in the Swiss Register of Commerce, the transfer of their Reims Company to the City of Berne and also they had registered in Switzerland trade-marks for champagne wine and all other sparkling wines which trade-marks contain not only the firm name G. H. Mumm & Cie., but the emblems, such as the Eagle with spread wings, Cordon Rouge and Cordon Vert, omitting only the word Reims.

"(h) That by a circular letter dated September 24, 1920, addressed to all their former agents, defendants did affirm their right to ownership of the trade-marks in all countries excepting France, her colonies, possessions and protectorates; also defendants stated in correspondence with certain agents that they intended to use the above named trade-marks for sparkling wines which would not have origin entirely in the champagne district.

"The Tribunal held on the law:

"That so far as the acquisition of the trade-marks is concerned, these were without doubt sequestrated and liquidated in France as appurtenances to the good-will and that this results not only from the statements of the liquidator which were confirmed during the hearings by the statements of the agent of the French government, but also by the fact that the French sequestrator, instead of showing himself disinterested as far as the marks in foreign countries were concerned, considered them as belonging to the property subjected to administration, and therefore the liquidator had in so far as possible done everything in order to effect renewal of the trade-marks.

"That it was the well understood intention to protect through registration of the trade-marks for champagne wines which were made in Reims by the firm of G. H. Mumm & Cie. and since such trade-marks were indissolubly connected with the good-will of the products represented thereby, it would be impossible to apply these trade-marks to a product having different origin without violating the trade-mark legislation; and as set forth in Articles 274 and 275 of the Treaty of Versailles, it would be impossible to do what the defendants want without provoking confusion which the said articles are expressly intended to prevent.

"Further under the rules and regulations contained in the Treaty of Versailles, it was the purpose that the allied and associate powers should seize all German property wherever it was located and to take the same as collateral for the payments which Germany was obligated to make, but this aim could not be attained if the trade-marks of a German firm established in France could not be sequestrated or liquidated in France while these rights were situated in a foreign country and they could not be sequestrated or liquidated in a foreign country while they belonged in an indissoluble manner to the good-will of the business in France, and, therefore, these valuable rights would disappear without anybody having advantage from them and that this would be contrary to the Treaty of Versailles.

"That the Peace Treaty of Versailles, in annex to Article 297, paragraph 15, and Article 306, last paragraph, expressly states that the trade-marks are considered to belong to the property subjected to liquidation in accordance with Article 297, subdivision b.

"That the defendants contested the right of the plaintiff to use the marks because the wines which they make are not identical with the same sold under the trade-marks· G. H. Mumm & Cie. as these wines were made by special processes and by the personal efforts and experience of Messrs. Mumm, from father to son.

"That such defense would have the consequence that not only the trade-marks in a foreign country but also the trade-marks in France could not be transferred (the defendants having especially recognized that the plaintiff had acquired them for France) and therefore it would be impossible to transfer any champagne trade-mark notwithstanding a number of the most important champagne houses have been transferred by their founders without the validity of those transactions at any time being questioned.

"That so far as the secrets of the making of the wine are concerned, those secrets were included in the sale and they were transferred to the plaintiff the latter having re-employed such members of the personnel of the firm Mumm who were able to assure the maintenance of the distinguishing qualities of the champagne Mumm.

"The Tribunal further held that the plaintiff has acquired at the same time with the good-will of Societe G. H. Mumm & Co., all manufacturing and commercial trade-marks which are connected with the business indissolubly and which existed the tenth day of January, 1920; that the plaintiff is authorized to have registered in its name in all countries those trade-marks and the defendants must not make any opposition to such applications for registration which the plaintiff has either made already or which it will make in the future.

"The Tribunal further held that in order to avoid all confusion in the future, the plaintiff must add to the name G. H. Mumm & Co., which it acquired, the words 'Successeur, Société Vinicole de Champagne'; but as to those champagne wines which plaintiff acquired from the liquidator through the sale, plaintiff need only stamp the labels in such manner as to make clear that it is the vendor of such wines.

"And the Tribunal further held, while it cannot be denied to defendants the use as a trade-mark of their patronymic name, yet, if they want to use it as a trade-mark containing their name, defendants must eliminate all elements by which confusion can be provoked between their products and the products of the plaintiff. Especially, defendants must omit for sparkling wines the use of all trade-marks, labels and other elements which would indicate champagne, Reims, Cordon Rouge, Cordon Vert, Eagle, etc. And in case the defendants make wine in the champagne district, all indications relative to Cordon Rouge, Cordon Vert, Eagle, etc. which have created confusion between their new fabrication and the liquidated good-will, must be omitted.

"In so far as damages are concerned which are claimed by the plaintiff, the Tribunal is of the opinion that defendants have not acted in bad faith and that therefore it is sufficient to re-establish the troubled commercial situation caused by the defendants, that the plaintiff is allowed to give large publicity to this judgment at the cost of the defendants.

"The court requested the German agent to assure the execution of this judgment."

This judgment and decree was recorded in the office of the appropriate department of the Secretariat of said Mixed Tribunal; i. e., the department thereof dealing with French and German claims.

20. On October 29, 1921, the aforesaid confirmation of transfer, dated September 9, 1921, of all the G. H. Mumm & Co. trade-marks—described nominatim in pursuance of the requirements of our law—to the plaintiff herein was recorded in the United States Patent Office.

21. On December 3, 1921, there was recorded in the United States Patent Office a certified copy of the court record of the clerk of the Court of the First Instance at Reims showing the sale to the plaintiff by the French liquidator on August 11, 1920, of all the business properties of G. H. Mumm & Co., i. e., as above indicated, its vineyards and other real estate, stock in hand, equipment, inventories, good will, trade-marks, and brands.

22. On June 8, 1922, the plaintiff as successor to G. H. Mumm & Co. applied to the United States Patent Office for registration in its name, as owner, of the American trade-marks Nos. 55,641, 55,642, and 55,643, which were then registered in the name of G. H. Mumm & Co., as owner thereof.

23. On August 28, 1923, the aforesaid application filed at the United States Patent Office in respect to the Mumm trade-mark No. 55,643 was granted, and it was registered in the plaintiff's name as owner and given as its number 172,400.

24. On November 6, 1923, the aforesaid application filed at the United States Patent Office in respect of the Mumm trade-mark No. 55,641 was granted, and it was registered in the plaintiff's name as owner and given the No. 175,387.

25. On December 16, 1923, there was a unanimous decision by the Mixed Tribunal in a second litigation which had been initiated by the plaintiff against the G. H. Mumm & Co. partners.

The title of this proceeding was: Plaintiff: Société Vinicole de Champagne of Paris, France. Defendants: Hermann de Mumm of Vitzneu, Switzerland; Walther de Mumm of Frankfort sur Main, Germany; Widow Emma de Mumm (née Passavânt) of Frankfort sur Main, Germany; and the German government.

An agreed summary of the proceeding showing the issues raised and the determination of the Tribunal thereon is as follows:

"The plaintiff prayed that defendants, jointly and severally, be ordered to pay to the plaintiff—

"(a) 25 million francs as damages up to the date of the filing of this suit;

"(b) Further damages to be estimated by the Tribunal;

"(c) That the defendants be ordered to pay all costs.

"The defendants prayed by counterclaim for damages alleging that plaintiff had not observed or acted according to the judgment of the Tribunal of October 24, 1921; and for payment by plaintiff of all costs."

The plaintiff contended:

"That the Société G. H. Mumm & Cie., in Berne, Switzerland, remaining in the same form and using the same business practices as before is contrary to the judgment of the Tribunal of October 24, 1921;

"Also that this same complaint exists regarding Société G. H. Mumm & Cie., of Frankfort, Germany;

"That in compliance with the judgment of October 24, 1921, defendants Mumm have done nothing in order to notify the authorities in the different countries where the trade-marks must be transferred to Société Vinicole de Champagne, that they would not make any opposition to such transfers; and that, therefore, these trade-marks could not be transferred to plaintiff which had acquired them in a legal manner, and that especially in Denmark where the defendants did not pay any attention to the questions which the competent authorities addressed to them;

"That the defendants upheld the opposition which they had introduced before October 24, 1921, in England and in the Argentine;

"That the defendants have claimed the trade-marks of the old G. H. Mumm & Cie. which had already expired January 10, 1920, could not be contained in the liquidation procedure which had taken place at that date, and that they were, therefore, entitled to ask for the registration in defendant's name if the words Reims and champagne would be suppressed. This has been done, especially in Sweden;

"That the defendants have claimed that their same rights apply to the marks which have been transferred by the liquidation as to the date of January 10, 1920, and which have not been renewed after that date; and in accordance with the assumed rights the defendants have made application for new trade-mark registrations of the trade-marks Cordon Rouge in Denmark and Cordon Rouge, Cordon Vert and Cordon Gout American in Paraguay;

"That on account of these actions, plaintiff has sustained heavy losses."

Defendant's counterclaim alleged:

"That the plaintiff committed grievous acts by the sale of its wine in Sweden under the trade-marks expired in 1917 and 1918, and newly registered by the defendants in 1920.

"That the plaintiff sold products in Denmark under trade-marks which have expired in 1917 before the liquidation and that in 1920 after the liquidation the defendants have those trade-marks newly registered for themselves; that the plaintiff sold the same products in Paraguay under the trade-names of the former firm of G. H. Mumm & Company, notwithstanding the trade-marks were newly registered on behalf of the defendants. Finally, that the plaintiff sold champagne in Italy after the judgment of October 24, 1921, without mention of the words 'Successeur Société Vinicole de Champagne'; and that further on the plaintiff has registered, without making the same addition, the trade-marks Cordon Rouge, Cordon Vert, in Germany. Therefore the defendants claim damages of ten million francs."

The Tribunal held:

"That in so far as the German government is concerned, the judgment of the Tribunal of October 24, 1921, requested the German agent to assure execution of said judgment of October 24, 1921; that nevertheless the German agent did not act at all, and that, therefore, the defendants Mumm were able to act in the manner in which they have; and the German Patent Office on March 2, 1922, when it was requested to transfer the marks registered in the name of the old Société G. H. Mumm & Cie., to the plaintiff, had refused to do so without the consent of the defendants Mumm.

"That the German Patent Office having held that the Tribunal had over-stepped its authority conferred upon it by the Peace Treaty, therefore, diplomatic channels had to be taken with the German Government so that the latter would induce the German Patent Office to register the trade-marks in the name of the plaintiff, and that the registration of these trade-marks took place August 15, 1922.

"In all of this, according to his brief, dated November 16, 1922, the German agent supported the actions and omissions of the defendants Mumm.

"The Tribunal made the point, to which all parties consented, that the widow Emma de Mumm (née Passavant) is not a party to this present suit."

The court further held:

"That the Tribunal is competent for this law suit in order to repair every prejudice resulting from the non-execution of its former decision.

"That Hermann and Walther Mumm were entitled to create in Berne a société-company under their patronymic name, but that in choosing the name of their ancestor, G. H. Mumm, the name which constituted the name of the liquidated firm, they have acted against the judgment of October 24, 1921, which judgment stated

that in case the defendants Mumm should use for their trade-marks their patronymic name, then everything should be done by the defendants to eliminate all elements of confusion. The statements concerning the Berne company apply equally as well to the Frankfort company.

"That the actions not only of the defendants Mumm, but of the defendant the German Government, were against the clear ruling contained in the judgment of October 24, 1921, and that such actions were contrary to the proper execution of that judgment.

"That the defendants Mumm had no right to lay claim to the trade-marks which existed January 10, 1920, without considering whether these trade-marks were in use before that date or afterwards on account of the special nature of the products which were protected by these trade-marks—the plaintiff is entitled in case of expiration to reclaim them; and that it would be iniquitous on the part of the defendants Mumm to try to retain by insidious maneuvers those things which had been liquidated and acquired by the plaintiff. So far as the German Government is concerned, it was held responsible for the decision of the German Patent Office in which the competency of the Mixed Arbitral Tribunal was contested, and in which the German Patent Office refused to make the transfer for the benefit of the plaintiff of all trade-marks belonging to the old firm G. H. Mumm & Cie. Further, the German agent who was bound, according to the judgment of October 24, 1921, to enforce the aforesaid judgment, has limited himself to notifying this judgment to the German Nationals and has acted therefore in flagrant opposition not only to the aforementioned judgment, but has encouraged defendants Mumm in their actions and omissions. Now, therefore, defendants Mumm and the German Government must pay damages.

"The Tribunal held that the actions of the defendants Mumm could not have taken place without the collusion of the German Government.

"The defendants Mumm have acted against all equity in numerous cases, and, therefore, the Court adjudges, as far as Hermann and Walther Mumm and the firms of G. H. Mumm & Cie. of Berne and Frankfort are concerned—holding them jointly and severally liable:—

"(a) That the firm name of the Société G. H. Mumm & Cie. in Berne and in Frankfort must be modified in such manner that each and every confusion with the old liquidated G. H. Mumm & Cie. is to be avoided.

"(b) That the commands contained in the judgment of October 24, 1921 must be observed in the strictest manner.

"(c) That the defendants Mumm, the two companies, must pay as damages to the plaintiff, before April 1, 1924, 3,500,-000 francs.

"(d) That in case they do not pay, they must pay ten thousand francs per day.

"(e) That the German Government must, before February 1, 1924, through the clearing office, pay as damages to the plaintiff, 2,500,000 francs.

"(f) That the defendants Mumm and their two companies in Berne and Frankfort, have to pay half of the costs of this law suit, the other half to be paid by the German Government. The agent of the German Government is invited to execute strictly the present judgment and to account for that before the 15th day of April, 1924.

"(g) That the counter-claim of the defendants be dismissed.

This judgment and decree was recorded in the appropriate department of the Secretariat of said Mixed Tribunal, i. e. the Department thereof dealing with French and German claims.

The said "Mumm partners" then asked for a "revision," which corresponds in this country to a petition for rehearing.

26. On December 18, 1923, the application filed at the United States Patent Office in respect of the Mumm trade-mark No. 55,642 was granted, and it was registered in the plaintiff's name as owner with the number 177,417.

27. On July 27, 1925, the petition for rehearing which had been applied for by the said Mumm defendants in respect of the Second Mixed Tribunal litigation was denied by the Tribunal.

28. On November 4, 1927, an application was made by the plaintiff to the United States Patent Office for the registration of two more trade-marks, Nos. 97,346 and 97,877, formerly owned by G. H. Mumm & Co., in the plaintiff's name as owner.

29. On April 3, 1928, the application just referred to was granted, and the trademarks were registered in the plaintiff's name as owner and given the number 240,714.

30. On August 14, 1930, the plaintiff filed a third petition with the Mixed Tribunal against the aforesaid former Mumm partners and the Mumm companies formed by them at Berne and Frankfort on the Main, on the ground that the former Mumm partners had disregarded the previous decisions and decrees of the Mixed Tribunal and had been guilty of infringement of those decrees by failing, when they used the name of Mumm & Co., to differentiate between the former G. H. Mumm & Co. of Reims, which the plaintiff bought, and the new Mumm companies in Berne and Frankfort which had been formed—after the plaintiff's purchase of G. H. Mumm & Co.—by the former Mumm partners, and asking for damages and other incidental relief.

31. On June 1, 1932, whilst this litigation was pending in the Mixed Tribunal—apparently in an endeavor to reach some sort of modus vivendi which would conveniently settle the disputes which seemed to threaten to be perennial between the former Mumm partners and the plaintiff—a private civil arbitration, under section 1003 of the French Civil Code, was agreed on between the plaintiff and the aforesaid Mumm partners as a means of settling and disposing of this third litigation. The proceedings under this arbitration have been marked as Exhibit 216 in this cause.

32. On July 11; 1932, the three arbitrators chosen under the said arbitration agreement, by a vote of two to one, prescribed as a modus vivendi for the parties that the Mumm partners referred to in the arbitration as the "Consorts Mumm" could use their patronymic for their own wine if it was followed at once by a statement of the date when the firm or company selling it had been formed and the place at which it was domiciled; that the former Mumm partners should not be allowed to re-establish their business at Reims even if they should decide to re-establish it in Champagne; that they must change their labels in certain respects; and that the plaintiff, Société Vinicole de Champagne, could use its name as successor of G. H. Mumm & Co. on its labels, and could, as owner, file, nationally and internationally, the trade-marks "Mumm" and "Mumm-Reims," except that they should indicate that they were the successor of G. H. Mumm & Co. at Reims, unless so doing would necessitate under the law of the country where the application was filed the issuance of a new trade-mark, in which event they should have the privilege of renewing the old trade-marks as they then existed.

33. On July 22, 1932, this arbitration award was confirmed by an order of the Civil Court of the Department of the Seine to be filed as a judgment, and it was filed as such under the provisions of the French Code of Civil Procedure.

On April 17, 1935, this judgment was set aside by a new judgment of said court.

This later judgment was appealed from on July 26, 1935, by Hermann Mumm and by the Frankfort partnership Mumm & Co. This appeal has not been decided.

34. On December 29, 1932, however, the plaintiff revived before the Mixed Tribunal the third litigation above mentioned.

35. On September 29, 1933, the defendant, the Mumm Champagne & Importation Company, Inc., an exact resurrection of the name of the First Agency Corporation, was formed under the laws of the state of New York with a capital of 100 shares, of which the person called Walther von Mumm, who was one of the former partners of G. H. Mumm & Co. of Reims and a party to all the above detailed litigations with the plaintiff herein, at first owned 70 per cent. of the stock, and was the active head as president of the corporation. This corporation, which will be called hereinafter the Second Agency Corporation, is now the exclusive agent in the United States of Mumm & Co. of Frankfort and of Champagne Mumm & Co. of Epernay and of Hermann Mumm.

Since May 1, 1934, Walther Mumm has owned the entire stock of the defendant corporation, and since October 2, 1934, he has continued as active head of the defendant corporation in the capacity of chairman of its board of directors.

36. On November 23, 1933, the Mixed Tribunal made its decision in the third litigation and held by a vote of two to one—the German member dissenting—that the arbitration agreement of June 1, 1932, under the French Civil Code, which at-

tempted a private settlement of a proceeding before the Mixed Tribunal, was without effect, because it had not been confirmed by the Mixed Tribunal, and that, consequently, the judgment of July 11, 1932, in the Tribunal Civile of the Seine based on the arbitration award was void and without effect in so far as the Mixed Tribunal was concerned.

The title of this proceeding was: Plaintiff: Société Vinicole de Champagne. Defendants: Hermann de Mumm of Vitzneu, Switzerland; Walther de Mumm of Frankfort sur Main, Germany; all the heirs of the late Emma de Mumm (née Passavant); Société Mumm & Co. of Berne, Switzerland; Société Mumm & Co. of Frankfort sur Main, Germany; and the German government.

An agreed summary of this proceeding showing the issues raised and the determination of the Tribunal thereon is as follows:

"Plaintiff alleges that contrary to the established findings of the Mixed Arbitral Tribunal, dated October 24, 1921, and December 16, 1923, the associates Mumm have by every means in their power endeavored to create confusion between their firm and that of the plaintiff. Notably by the use of the name Mumm & Co., and the nomenclature of its products without any additions whatever to their name and by the use of labels similar to those belonging exclusively to the plaintiff.

"The plaintiff demanded of defendants:—

"(1) Damages of six million francs and other damages for further infringements;

"(2) That the firm Mumm & Co. of Berne and of Frankfort be forthwith stricken from the Register of Commerce of the cities of Berne and Frankfort;

"(3) That the defendants make no use whatsoever of the name Mumm for the production and sale of sparkling wines;

"(4) That the Tribunal direct that the associates Mumm may not use the name Mumm as a commercial element, nor with reference to anything appertaining to the business of sparkling wines unless the name be preceded by the christian name or names of each of the associates concerned.

"(5) That the names should be the same size and character throughout, indicating also the seat of the establishment with mention of 'House founded ————,' indicated in characters at least half the size of those employed by the christian names or surnames.

"(6) That the name Mumm must not be used on labels, corks, packing elements of champagne and sparkling wines, nor on any documents of publicity, etc.

"(7) That they pay all costs.

"The defendants, Hermann and Walther Mumm and the two sociétés Mumm & Co. of Berne and Frankfort, demanded dismissal of the suit brought by the plaintiff and the condemnation of the plaintiff to pay damages of 500,000 francs; and demanded that the plaintiff must suppress all registrations of the trade-mark 'Mumm' or the trade-mark 'Mumm-Reims'.

"The heir of Emma de Mumm (née Passavant) made request to be exempted from this law-suit. The same request was made by the German Government.

"The defendants stated that the plaintiff had undertaken publicity under the name Champagne Mumm without addition whatsoever, contrary to the decisions of the Tribunal which directed that the firm and trade-marks should be designated 'G. H. Mumm & Cie., Successeur Société Vinicole de Champagne.'

"The defendants stated that the plaintiff had registered in the United States by notice appearing in the New York Journal of Commerce of September 14, 1933, the firm Mumm & Company, Inc.

"The plaintiff alleges that defendants in utilizing the name Mumm & Company for their firm name and trade-marks and using a red-cornered label, in employing the appellation 'Mumm's Extra Dry' have created confusion between their firm name and that of G. H. Mumm & Cie. of Reims.

"The defendants have produced a private arbitration award dated July 11, 1932, which has been made on the basis of an agreement signed by the contesting parties June 1, 1932, and to which on July 22, 1932, the president of the Civil Tribunal of the Seine has given his order for execution.

"The Tribunal did not agree with these contentions of the defendants because the arrangement between the parties had the character of a compromise, and according to Article 62 of the rules of procedure of the Mixed Tribunal such a

transaction must be approved by the Tribunal, but the present transaction had not been approved by the Tribunal.

"The Tribunal pointed out that this approval of a compromise is not only necessary in safe-guarding the rights of the parties themselves, but also of a nature affecting public interest of third parties. The present law-suit concerning trade-marks affects third parties who have the greatest interest in that no confusion should take place between the products of different producers. The defendants cannot invoke the fact that the president of the Civil Tribunal of the Seine issued an order for execution of the private arbitration award dated July 11, 1932, as the award itself is null and void. Therefore the Tribunal assumed jurisdiction.

"The Tribunal reached the following conclusions:

"That by the judgment of October 24, 1921, it forced the plaintiff to add to the firm name of G. H. Mumm & Cie., the word 'Successeur Société Vinicole de Champagne.'

"That it had by the same judgment of October 24, 1921, forbidden that the associates Mumm use in their trade-marks containing their name any elements which by their nature provoke confusion between their products and those of the plaintiff in so far as sparkling wines are concerned.

"That notwithstanding this decision, defendants have maintained the Société G. H. Mumm & Cie. in Berne and Frankfort.

"That contrary to the decision above mentioned the defendants have not notified the proper authorities in the different countries in which the trade-marks were to be transferred that the opposition to the transfer of the trade-marks was withdrawn.

"That the court has ordered that the Sociétés which were founded at Berne and Frankfort had to modify their name in order to obviate any confusion with the former liquidated Société of Reims.

"That further, defendants have in 1932, founded a firm at Epernay, France, under the name Mumm & Co., a corporation with limited liability.

"That the Tribunal found from official documents produced before it that the patronymic name of the defendants is not Mumm or von Mumm, but that the name is Mumm von Schwarzenstein.

"That in the Official Journal of the Empire and of Prussia, dated May 30, 1883, it is stated as follows: 'His Majesty the King is pleased to grant the title of Purveyors to the Royal Court to the Merchants Peter Hermann Mumm von Schwarzenstein and Max von Guaita of Frankfort a. Main Germany, proprietors of the firm of Peter Arnold Mumm of Frankfort a. Main Germany, and co-partners of G. H. Mumm & Cie. of France.'

"The Tribunal further refers to an extract of the Civil Register from the town of Wiesbaden, containing a marriage of one of the defendants Peter Arnold Maximilian Hermann (called Georg) Mumm von Schwarzenstein, son of Peter Arnold Gottlieb Hermann Mumm von Schwarzenstein and Olga von Struve.

"Notwithstanding that the defendants have declared their willingness to abandon part of their name which consists of the words von Schwarzenstein, the Tribunal stated such abandonment to be an unwarranted step employed for business reasons, and cannot be invoked by the defendants to justify the choice of the trade name and trade-marks of Mumm & Co.

"Therefore, the court decided:—

"That the use of the patronymic name cannot be permitted except under restrictions tending to avoid all possibility of confusion, and that it is for greater reasons inadmissible to change the patronymic name, a change that would create such a confusion with the aforesaid two mentioned judgments of the Tribunal which the Tribunal wishes to avoid under all circumstances.

"That if the defendants could freely use the trade-mark Mumm & Co., confusion with the mark G. H. Mumm & Cie. would be certain. Therefore the court decided that the aforementioned agreement of June 1, 1932, constitutes an attempted compromise and is without effect, not having been approved. Furthermore, that the arbitration of July 11, 1932, based on said agreement is equally without effect. Further, the Tribunal prohibits the defendants from making use of manufacturing and commercial marks containing the word 'Mumm' unless this term be indissolubly connected with the words 'von Schwarzenstein' printed in characters of the same shape, color, and dimension as those of the word 'Mumm.' Further, that the words

'Mumm von Schwarzenstein' be indissolubly connected with the mentioned 'House founded in ——, at ——,' in characters of a size at least half the size used for the name. And further, that the defendants are ordered to abstain from the use of the term 'Mumm' in its manufacturing marks and commercial designations wherein appears the name of a region, town, or other French locality.

"The defendants were ordered to withdraw within eight days commencing from the present judgment, the registration of all marks which would be contrary to the rulings of the present judgment as well as of the judgments of October 24, 1921, and December 16, 1923.

"Further, the Tribunal directed that the marks of the defendants must not contain the mention 'exclusively made from Champagne wines,' or other similar statements in any language whatsoever.

"The Tribunal further directed that the defendants guard against third parties using marks in publicity made on behalf of the defendants, that will be contrary to the present judgments, as well as to the two judgments before mentioned.

"The Tribunal further directed that for each day's delay in carrying out the present judgment and the judgments of October 24, 1921, and of December 16, 1923, as well as for each infraction of the prescriptions therein contained, the defendants shall pay to the plaintiff the sum of 10,000 francs.

"The Tribunal dismissed the case against the heirs of Emma de Mumm (née Passavant) with the exception of Hermann and Walther Mumm and dismissed further the case against the German Government.

"On the counter action, the Tribunal directed that the plaintiff conform to the rules contained in the judgments of October 24, 1921, and of December 16, 1923, and ordered that plaintiff when making use of the name Mumm or the name Mumm-Reims, must add 'Société Vinicole de Champagne, Successeur' in the same characters as those hitherto employed by them. The Tribunal also directs that the plaintiff must strictly guard against third parties using marks in publicity made on behalf of the plaintiff that will be contrary to the judgment herein as well as the two judgments of October 24, 1921, and December 16, 1923.

"The Tribunal decreed that for each day's delay in carrying out the said judgment the plaintiff will have to pay to the defendants the sum of 10,000 francs.

"The counter-claim of the defendants as regards the remainder of their claim is dismissed (the defendants having conceded the fact that the plaintiff had nothing to do whatever with the formation of the corporation Mumm & Co., Inc., New York, this having been done by quite different parties, namely, United States Corporation Company which is a branch of the International Corporation Co., Paris, with which the plaintiff is neither directly or indirectly connected), whilst Walther Mumm with other persons had constituted in September 1933, in the United States, the Société 'Mumm Champagne & Importation Co., Inc.'

"The Tribunal ordered that a third of the costs have to be borne by the plaintiff and two-thirds by the defendants.

"The court directed the agents for the French and German Governments to see to it that this judgment was enforced in the two respective countries."

The German member of the Mixed Tribunal dissented from this decision, apparently on the ground that there was not any basis for holding the award in the civil arbitration void, and that in any event the Mixed Tribunal was without jurisdiction to deal with questions of unfair competition which should be left to the civil courts. A copy of the dissenting opinion has been marked in evidence.

This judgment and decree was recorded in the appropriate department of the Secretariat of said Mixed Tribunal; i. e., the department dealing with French and German claims.

37. On March 29, 1934, plaintiff filed a suit in Epernay, France, against the partnership Champagne Mumm & Co. consisting of said persons called Hermann Mumm and J. Weiland of Paris, which partnership is registered in Epernay as "Champagne Mumm & Co., Maison fondce en 1932." This suit seeks to prevent the use in France of said firm name containing the word "Mumm." This suit is still pending and undecided.

38. On May 26, 1934, plaintiff seized in Reims by attachment some 140 cases of champagne wines and 60 empty cases, about to be shipped by Champagne Mumm & Co. of Epernay to defendant corporation at New York; all these cases were marked in some manner with inscriptions containing the word "Mumm." On May

28, 1934, said preliminary attachment was confirmed by the Court of Reims. Plaintiff moved to make said attachment permanent and condemn the goods, but the court declined to do so, in view of the pendency of the appeal in the Paris court from the order of April 17, 1935, cancelling the arbitration award.

39. That plaintiff's product is sold as "Mumm Champagne" throughout most of the world, and has met competition with defendant's product under the name "Mumm" only in the United States.

40. In addition to those trade-marks registered by plaintiff in the United States, as herein stated, plaintiff has also registered its trade-marks in almost every civilized country of the world, including state registrations in New York, Illinois, New Jersey, Louisiana, and California.

41. After the entry of the judgments on the first and second Mixed Tribunal decisions, defendant's organizer, hereinafter referred to as Walther Mumm, came to the United States in 1929, and, in anticipation of the repeal of prohibition, incorporated defendant on September 29, 1933, or twelve years after plaintiff's first United States trade-mark registration No. 177,417.

42. It does not appear in the record that any steps were taken by any of the Mumm partners to cancel any of plaintiff's United States trade-mark registrations above referred to. In any event, they still stand as registered by the plaintiff as owner thereof.

43. On October 13, 1933, before defendant sold a bottle of its product, defendant and its incorporators were notified by plaintiff by registered mail of plaintiff's asserted rights in the premises, both under common-law trade-mark and under its United States trade-mark registrations for "Mumm" and "G. H. Mumm."

44. Plaintiff has been diligent in defense of its rights, for it has filed two other suits in this court, one against a firm called "Mumm & Co." and the other against a firm called "G. H. Mumm Incorporated," and obtained in the case of "Mumm & Co." a decree pro confesso on January 13, 1935, and in the case of "G. H. Mumm Incorporated," a decree pro confesso on January 23, 1935. The defendants in these suits were not connected with the defendant in the present suit or with the former Mumm partners.

45. On January 30, 1934, the present suit was started on the equity side of this court asking inter alia an injunction against the use of the word "Mumm" in the defendant's name and of its use in connection with trade-marks or labels in the sale of champagne wines.

46. As acts of unfair competition and instances of confusion, I find the following:

(a) The defendant and its distributors have caused letters, circulars, booklets, pamphlets, and scripts to be distributed, advertisements to be inserted in newspapers, magazines, periodicals, programs, and on billboards along the route of the New York, New Haven & Hartford Railroad, in which appeared "G. H. Mumm," "Mumm & Co.," "Mumm & Co. of Epernay," as producers. Particular reference therein was made to the tasting abilities of "G. H. Mumm."

(b) Statements were made therein such as "Mumm Champagne is Genuine only when Labelled 'White Top'—'Black Top' and bearing the coat of arms of the Mumm family"; "The White Top only assures traditional Mumm quality." The coat of arms of the "Mumm" family was pointed out as the source of true origin; "Guaranteed by Mumm"; "Reflecting the Tradition of Mumm Champagne Famous for Five Generations"; also a statement was made to the effect that plaintiff in the French government's liquidator's sale had purchased merely a "name" and a "label," and that defendant was the representative of the real "Mumms."

(c) Purchasers of defendant's products have made the declaration that, as defendant's product could be sold as "Mumm Champagne," they would continue to buy it and sell it, and in certain instances have declined to buy plaintiff's "Mumm's Extra Dry." Patrons of hotels and restaurants who ordered "Mumm Champagne" have in certain instances received defendant's product. Certain beverage cards list defendant's product as "Mumm's Extra Dry," or "Mumm & Co. White Top," and others list plaintiff's "Cordon Rouge" and defendant's "Mumm's Extra Dry."

(d) Plaintiff's local sales agent has received telephone calls intended for defendant, and defendant's office has been telephoned to when it was the intention to have reached plaintiff's sales agent. The parties herein were listed in the Man-

hattan Telephone Directory for the summer of 1935 as:

Mumm Champagne & Importation Co., 247 Park Avenue;

Mumm Champagne & Importation Co. of New England, 30 Rockefeller Plz.;

Mumm G. H. Champagne Société Vinicole de Champagne Successors & Associates, Inc., 610 5 Ave.;

Mumm, Walther, 270 Park Ave.

In the winter 1935–36 the Manhattan Telephone Directory, distributed during this trial, the listing is as follows:

Mumm Champagne & Importation Co. of New England, 30 Rockefeller Plz.;

Mumm G. H. Champagne Société Vinicole de Champagne Successors & Associates, Inc., 610—5 Av.;

Mumm W. v. Wine Co., 247 Park Av.;

Mumm Walther, 247 Park Av.

Notwithstanding that the Mumm Champagne & Importation Company, Inc. of New England, defendant's sales agent, had advised plaintiff on September 12, 1935, that it had discontinued its corporate name, after having received a copy of the preliminary injunction, its name still remains listed as above.

The foregoing name listed as the "G. H. Mumm Champagne, Société Vinicole de Champagne Successors & Associated, Inc.," is plaintiff's local sales agent.

(e) Correspondence between defendant and its distributors and customers show emphasis on the name "G. H. Mumm," although no one of that name is connected with defendant.

(f) Invoices of defendant show sales listed as "Mumm Champagne" and "Mumm's Extra Dry."

(g) Defendant's first importations were a sparkling wine from Eltville, Germany, and had printed "Mumm & Co." in large letters on the body and neck labels. Defendant's Eltville wine is shipped in casks from the Champagne district of France to Mumm & Co., Eltville, Germany, and is prepared and bottled there.

(h) The firm Mumm & Co. was formerly composed of Hermann and Walther Mumm; the latter is, however, no longer a member thereof.

(i) Under the Madrid Convention to which Germany adheres, but to which the United States does not adhere, this wine cannot be called "champagne" in Germany, and is therefore labeled "sparkling wines,"

but the importer's strip label prominently displaying the words "Mumm Champagne" has been used by defendant or its distributors to cover the words "Sparkling Wine" on the main label. This "Sparkling Wine" has been advertised as champagne made of grapes from the Champagne district of France.

(j) Defendant's product labeled "Epernay, France," has no maker's name on the label. Defendant rented a cellar in Epernay, which is about ten miles from Reims, but did not make use of it.

The place of business in Epernay of defendant's alleged supplier of "Mumm & Co. of Epernay" was not found in Epernay, France, despite diligent search made by plaintiff, but it is claimed by defendant to be at No. 70 Avenue de Champagne, in the House of de Venoge.

The alleged place of business in Paris of "Mumm & Co. of Epernay" could not be found, although careful investigations were made on plaintiff's behalf, but it is claimed by defendant to be at 145 Avenue Malakoff.

(k) Defendant's bottled product bought in the open market by Hermann Mumm, copartner of "Mumm & Co. of Epernay," is stored unlabeled in the place of one Lejeune immediately adjacent the place of business of plaintiff in Reims, France.

(l) The shipper's declaration of this Epernay wine has no reference to "Mumm" in any manner, neither as part of "Mumm & Co. of Epernay" nor as part of defendant's corporate name, but the shipper's name reads "Champagne White Top or Black Top, by J. Weiland, Manager." The consular invoice, however, names Mumm Champagne & Importations Company of New York as consignee.

(m) No label or marking bearing the word "Mumm" is applied to the bottles or cases in France; this being done in Masstricht, Holland.

(n) Defendant's products were first labeled with defendant's importers' label. On this defendant's original corporate name and all letters were of uniform size. A later labeling showed the words "Mumm Champagne" in exaggerated letters and considerably larger than those of the remainder of the corporate name.

(o) After July 22, 1935, the date of the preliminary injunction, and in compliance therewith, defendant's product bore

the name "W. v. Mumm Wine Co., Inc.," in large letters, and underneath the words "Not connected with Société Vinicole de Champagne," the letters thereof being half the size of those in the word "Mumm" above, and again underneath that, as a third line in parenthesis, "(Successor to G. H. Mumm & Co.)." This arrangement made it equivocal which was the successor to G. H. Mumm & Co.

(p) All brands of champagne on the New York market prominently display the name of the maker on the body or main label of the bottle, with the exception of defendant's "Epernay" champagne. A requirement of the New York State Liquor Commission is that the maker's name must prominently appear on the main label. Defendant does not have the maker's name on its bottles.

(q) No champagnes in competition with the plaintiff, except those of the defendant, bear the importer's strip label *above* the main label, but the defendant places its strip label bearing, among other things, the word "Mumm," on the front of the bottle immediately above the main label, on which is prominently displayed the word "Champagne," so that the words "Mumm" and "Champagne" strike the eye substantially simultaneously.

Most of the importers' strip labels are placed on what is called the rear of the bottle, but defendant's is, so far as the records show, always placed on what is called the front thereof in a prominent position above the main label.

The bottles of both the plaintiff and the defendant have a spirally arranged neckband on them.

47. Prior to 1914 Walther Mumm in his personal or individual capacity separate from G. H. Mumm & Co. had no business in champagne or wine, nor had he registered any trade-marks bearing the name "Mumm" apart from those registered by his firm G. H. Mumm & Co. The same is true with respect to Hermann Mumm.

Upon the incorporation of defendant on September 29, 1933, Walther Mumm had no going business; therefore he did not transfer any assets nor registered trade-marks for the word "Mumm" to the newly formed corporation.

48. All the acts of unfair competition found herein against this defendant were committed in the United States on and after the date of its incorporation, to wit, September 29, 1933, and before the preliminary injunction above mentioned.

49. By article 297 of the Treaty of Versailles, the property of German nationals in France became the property of the French government, and the German government undertook to indemnify its nationals therefor.

In consequence of this undertaking and of indemnity laws enacted in pursuance thereof by the German government, the former German partners of G. H. Mumm & Co. were indemnified for the property they had lost in France by several payments, amounting in all to more than $1,700,000 gold dollars. These payments covered, not only G. H. Mumm & Co.'s cash in French banks and accounts receivable, which were not purchased by the plaintiff, but also what the plaintiff purchased as hereinabove described. The claim of the defendants that this was not full indemnity to them, but only about 10 per cent. of the liquidation value of what the plaintiff bought from the French liquidator, is entirely immaterial and irrelevant here.

50. The Alien Property Custodian of the United States seized and liquidated the First Agency Corporation on the ground that it was German owned. All the proceeds of this liquidation, consisting of money, bonds, stock, and also, I believe, a few cases of brandy in the possession of the Alien Property Custodian, were sued for in a suit commenced on December 20, 1921, in the Supreme Court of the District of Columbia in behalf of the German partners in G. H. Mumm & Co., and, as a result of this suit, cash and the properties above mentioned, amounting in value to circa $500,000, were turned over to them.

It should perhaps be here noted that before this suit was commenced the Mixed Tribunal had decided on October 24, 1921, that the French government had seized and sold all the good will of the firm of G. H. Mumm & Co. in France, and that such sale carried with it all rights of the firm to trade-names and trade-marks in all foreign countries.

The proceedings before the American Alien Property Custodian, therefore, merely meant the recapture by the former German partners of G. H. Mumm & Co. of certain assets which their agency had in this country, but did not touch on any

question of the good-will of G. H. Mumm & Co. or its trade-name or trade-marks here.

51. Rules of Procedure, dated April 2, 1920, governing the practice of the Mixed Franco-German Arbitral Tribunal, here relevant, are as follows:

(a) "Article 79: The request for revision must be addressed to the Tribunal. It can only be motivated by the findings of a new fact which has such nature as would exercise a decided influence on the decision and which was unknown at the time of the hearing, both to the Tribunal itself and to the party that requests the revision."

(b) "Article 80: The revision for procedure can only be opened by a decision of the Tribunal stating expressly the existence of the new facts, recognizing that such fact has the character provided for in the previous article, and stating that for this reason the request for revision is acceptable.

"No request for revision can be presented later than one year after the date when the decision was rendered."

(c) "Article 82: The request for revision does not suspend the execution of the decision unless the Tribunal renders a different ruling in admitting the revision."

(d) "Article 94: The Secretariat keeps besides for each section of the Tribunal a register (B) containing the text of the decisions and judgments of the Tribunal."

52. The Secretariat was situate in Paris.

53. The filing of a decision and judgment of the Mixed Tribunal in accordance with article 94 completes the judicial act of the Tribunal and constitutes the entry of a judgment or decree by the Tribunal.

54. After the decree was thus filed in the Secretariat, if the successful party wished to issue a writ of execution to enforce the decree, it was provided that such writ should be issued from a court in Berlin, if against German citizens, and from a court in Paris, if against French citizens.

In greater detail this practice was as follows:

A German law, dated August 10, 1920, provides that, in order to execute a judgment of the Mixed Tribunal in Germany, the German agent must make a transla-tion of the judgment into German, which, according to the rules above mentioned, is originally in French, and deliver such German legalized copy of the judgment to the French party; and the French party in turn obtains from the District Court No. I of Berlin, Germany, an order of execution, which court was made competent by the German government to execute judgments and decrees of the Franco-German Mixed Tribunal.

If execution of any judgment of the Mixed Tribunal is desired by a German party, the Department of the Secretariat remits a legalized copy of the judgment, which is in French, to the German party. The German party then obtains an order for execution from the Tribunal Civil of the First Instance of Paris which was made competent by the French government to execute judgments and decrees of the Franco-German Mixed Tribunal.

55. The judgments of the Mixed Tribunal rendered respectively on October 24, 1921, and December 16, 1923, were duly translated and certified in accordance with the foregoing practice. They then were filed with the District Court I in Berlin, Germany, and executions were issued on them and served on the German parties involved.

56. The judgment in the third litigation before the Mixed Tribunal, dated November 23, 1933, was never thus executed, because the German agent in that litigation declined to translate the decision into German, and therefore execution could not issue from the Berlin District Court No. I.

57. After some delay, an application was filed for rehearing on this third judgment of the Mixed Tribunal and consent to such rehearing was granted. However, a rehearing has not yet taken place, allegedly due to the illness of counsel for the German defendants. Therefore I find that the third decision of the Mixed Tribunal, rendered November 23, 1933, still stands, for, according to the above-quoted article 82 of the Rules of Procedure governing the Mixed Tribunal, a judgment stands until revised.

58. Whilst the Eighteenth Amendment to the United States Constitution and the acts of Congress in pursuance thereof were in force, the plaintiff's champagne was imported into the United States and sold for medicinal purposes under the

United States trade-marks hereinabove mentioned.

59. Both Hermann Mumm and Walther Mumm have grown up in the champagne business and Hermann Mumm was the head partner of G. H. Mumm & Co. from 1899 until 1914, and they have always used the name "Mumm," "deMumm," or "von Mumm" socially and in business.

60. However, Walther Mumm's birth certificate and passport show his patronymic to be Mumm von Schwarzenstein. Numerous documents, such as a birth certificate, a vaccination certificate, school diplomas, a marriage certificate, and a marriage contract show that his brother Hermann's patronymic is also Mumm von Schwarzenstein.

Walther Mumm, in transferring the Hong-Kong trade-mark rights of G. H. Mumm & Co., as required by the first and second decisions of the Mixed Tribunals, signed his name, at the request of the British Vice Consul in Berlin, "Walther Mumm von Schwarzenstein, known as Walther von Mumm."

■ 61. There is not any satisfactory evidence in the case to justify the use of the prefix "de" or "von" before the word "Mumm" in Walther Mumm's alleged name.

It is found, therefore, as a fact on the evidence produced in this cause—quite independently of the third decision of the Mixed Tribunal—that the name of the defendant's principal incorporator and present sole owner is not Walther von Mumm, as alleged in the fourth separate defense, but that, whatever he may choose to call himself or however he may be commonly known, he inherited from his father the patronymic Mumm von Schwarzenstein, and, consequently, he may be legally and properly designated as Walther Mumm von Schwarzenstein.

62. If there was once a distinction under German law between the family name and the so-called "mark of nobility"—in this case between "Mumm" and "von Schwarzenstein"—it was obliterated by the provisions of the Weimar Constitution, hereinabove set forth, which, so far as here appears, have not been changed in this regard by the recent changes of administration in Germany, for the "mark of nobility" was thereby fused with the family name, and the result of such fusion in this case is that the German name of the persons, to whom I have been referring as "Mumm" for convenience, is "Mumm von Schwarzenstein."

If, under the Weimar Constitution, it is a question of election as to whether an ennobled person will accept this fusion of his family name with his mark of nobility or not, which is perhaps not clear from the record, it is perfectly certain that there is no evidence that the so-called "Mumm" family has elected not to have its "mark of nobility" fused with its family name.

VI. On the foregoing facts I have the following comments to make, and I reach the conclusions of law hereinafter indicated:

■ 1. For the reasons which I stated in my opinion on the motion to strike out defenses in this case, Société Vinicole De Champagne v. Mumm Champagne & Importation Company, 10 F.Supp. 289, at pages 294 to 296, I hold that the sale by the French liquidator of the properties and business of G. H. Mumm & Co., which was a *société en nom collectif* formed under French law, with its domicile at Reims, France, conveyed to the plaintiff the good will of G. H. Mumm & Co. and the ownership of the trade-name and the trade-marks which were symbolic of that good will wherever they had been or might be used.

2. A *société en nom collectif,* which is a form of legal organization, unknown to our law, seems to recognize a partnership to a considerable extent as a legal entity. It may be described, with sufficient accuracy for present purposes, as being a partnership of which the firm name does not contain the names of all the partners and which may sue and be sued in its firm name. As to the marshaling of assets, its status is apparently similar to the status of a partnership under our bankruptcy laws.

3. G. H. Mumm & Co. was not only domiciled at Reims, France, but it manufactured champagne only at that place, and from 1854 at least until the European war the firm had a large and most successful trade in the United States through the agents and distributors above mentioned.

The word "Mumm" has by this long identification with an excellent product acquired in the champagne trade so settled a secondary meaning as representing a brand of champagne that any name

which the defendant here, as the agent of Hermann Mumm and his companies. may be allowed to use, will unfairly impinge on the plaintiff's trade if the name "Mumm" is allowed to be featured in any way in connection with the word "Champagne."

4. The trade-marks used by G. H. Mumm & Co. for their champagne were used by them for many years, and were registered by them as owners, not only in France, but also in the United States Patent Office, under the terms of section 2 of our Trade Mark Act, title 15, United States Code, § 82 (15 U.S.C.A. § 82).

5. So far as G. H. Mumm & Co.'s trade-marks in this country are concerned, the registration by the plaintiff of those trade-marks as owner has been fully regularized and has remained unchallenged here, in some cases for upwards of twelve years, and in all cases for upwards of seven years.

6. The agent distributors of the G. H. Mumm & Co. champagne in the United States had not, so far as any trade rights in regard to those champagnes were concerned, anything more than the legal right to sell, whilst the relationship of the agency existed, such champagnes as were shipped to them by G. H. Mumm & Co. from Reims, France, in bottles bearing on their labels some or other of the above-mentioned trade-marks of that firm.

7. The Mumm family, which had built up the business of G. H. Mumm & Co., and which in the present generation is represented by Hermann and Walther Mumm, whom I am still calling Mumm for the sake of convenience, lost the business by the fortunes of war, and now are unwilling to abide by that arbitrament, although they have been indemnified under the provisions of the Treaty of Versailles and under German laws made in pursuance thereof in an amount which, in so far as it may have any relevancy here, I must assume to have been what the German government considered a just compensation for their loss.

8. From the time peace was restored between France and Germany by the Treaty of Versailles, Hermann and Walther Mumm have consistently maintained a somewhat surreptitious unfair competition with the plaintiff in France and elsewhere, and that the instances of unfair competition which have now emerged into the open on the American scene, owing to the repeal of the Eighteenth Amendment, are merely new evidences of a policy which they have been continuously following for years.

9. When in pursuance of this policy and, in spite of the repeated decisions of the Mixed Franco-German Tribunal above cited, Walther Mumm incorporated the Second Agency Corporation in 1933, he did so with the intention of trespassing as much as he could by this artful means on the good will of G. H. Mumm & Co. which the plaintiff had acquired by purchase from the French liquidator.

10. Since 1873, when the German Emperor and King of Prussia granted to the Mumm family a renewal, as Mumm von Schwarzenstein, of their ancient family nobility, the family, which I still call Mumm for the sake of convenience, have, for commercial purposes involving the sale of champagne in France and elsewhere, consistently kept "von Schwarzenstein," as the more obviously German part of their name, in the background, until it was apparently somewhat unexpectedly dragged into the proceedings which led to the third decision of the Mixed Tribunal rendered as above mentioned on November 23, 1933.

11. The application for a rehearing of the aforesaid third decision of the Mixed Tribunal has been granted and appeals have been taken by the Mumms, as above noted, from the several judgments of the French courts herein referred to, but these facts do not, so far as I am concerned, mean anything more than that the Mumms have not acquiesced in those decisions. I cannot assume that on any rehearing or appeal the tribunals involved will make other decisions than those they have already made, but I must take all these juridical situations as I find them.

12. I hold, therefore, that all three decisions of the Mixed Tribunals are res judicata as between the plaintiff and Walther Mumm.

13. The law of the case, which was made by my interlocutory decision above mentioned, remains unchanged except in so far as the facts were changed by evidence on the final hearing. United States v. Davis (D.C.) 3 F.Supp. 97, 98, 99.

14. There has been only one change in the facts shown on this final hearing from the facts on which I relied in my interlocutory decision. That change is that Walther Mumm is now shown to be the sole owner of all the stock of the defendant corporation as well as the active operating head thereof.

In view of this change in the facts, the law of the case is modified to this extent only:

I now hold that the judgments of the Mixed Franco-German Tribunal are res judicata as against the defendant corporation, for, under the circumstances now shown, Walther Mumm cannot draw a corporate cloak about himself and claim that the defendant corporation, which he has formed as a convenient alter ego, is not bound by judgments by which he is bound.

15. But, if I am wrong in holding that the third judgment of the Mixed Tribunal, rendered on November 23, 1933, is res judicata as between the plaintiff and Walther Mumm and between the plaintiff and the defendant corporation, I have, quite independently of that decision of the Mixed Tribunal, ample evidence in the present case to establish the true patronymic of what I have been calling the "Mumm" family.

16. The plaintiff's purchase from the French liquidator of the property seized by the French sequestrator is legally the same as a voluntary sale to it by G. H. Mumm & Co. of that firm's property, good will, trade-names, and trademarks. Koppel Industrial Car & Equipment Co. v. Orenstein & Koppel Aktiengesellschaft, 289 F. 446, 451 (C.C.A.2). But the defendant should be allowed to make use of his name in such fashion as will not be unfair vis-à-vis the plaintiff. Koppel Industrial Car & Equipment Co. v. Orenstein & Koppel Aktiengesellschaft, 25 F.(2d) 716 (C.C.A.2).

17. With the characteristic waywardness of facts, the patent of nobility granted to Walther Mumm's grandfather has come back to haunt his grandson, and it is now admitted that, although it is claimed that Walther Mumm has not used the name "Mumm von Schwarzenstein" socially or in business, and hence that Mumm might be considered to be his name for general purposes (cf. Smith v. United States Casualty Company, 197 N.Y. 420, 428, 90 N.E. 947, 26 L.R.A.[N.S.] 1167, 18 Ann.Cas. 701), the name "Mumm von Schwarzenstein" is an appellation which he might be forced to use without, as the phrase is, "calling him out of his name," because it is the name which he inherited from his father.

18. Here we have not the question which was really involved in the New York case above mentioned, of enforcing a right under a policy of insurance which the defendant sought to defeat because a name by which the plaintiff was commonly known was used in the policy instead of what the defendant claimed was the plaintiff's real name. The question in that case was really as to the identity of the assured in a policy.

In the instant case the question is different. It is whether a man may continue to use in the same business as the plaintiff, to whom he has sold out, a name by which he chooses to be commonly known when the use of that name opens the door to unfair competition with his plaintiff vendee and to confusion in the trade.

It is obvious, I think, that he should not be allowed to do so.

Certainly, it is not unfair under such circumstances that a man should be forced to use his real patronymic in order to insure, as far as possible, that such unfair competition and confusion in the trade will be avoided in future. It is well that tendencies toward unfair competition and confusion should, in so far as it is possible, be stopped at the source.

Accordingly, I hold that, in connection with the champagne business, as chairman of the defendant company, Walther Mumm may not use any name other than Walther Mumm von Schwarzenstein.

VII. The decree to be granted herein must require:

1. That the use by the defendant company and by Walther Mumm von Schwarzenstein as its chairman of the name "Mumm Champagne & Importation Company, Inc.," and "W. v. Mumm Wine Company, Inc.," should be perpetually enjoined, and that the defendant, in changing its name, be limited in its choice of names either to "Walther Mumm von Schwarzenstein, Inc.," or to "Walther Mumm von Schwarzenstein Corporation," or to "von Schwarzenstein Importation Company, Inc."

2. That the defendant and Walther Mumm von Schwarzenstein, as its chairman, and its other officers, agents, and servants, should be perpetually enjoined from using, in connection with the advertising of champagne in any form whatever, the word "Mumm," unless accompanied by the words "von Schwarzenstein" printed on the same line in letters of exactly the same size and color as the word "Mumm."

3. That the use of the words "Mumm von Schwarzenstein" should not be allowed on the same side of the bottle as the word "Champagne," so that there will not arise any question as to whether the word "Mumm" and the word "Champagne" are so contiguous as to create confusion between the plaintiff's champagne and any champagne which the defendant corporation and Walther Mumm von Schwarzenstein as its chairman, its other officers, agents, and servants, may import and sell in this country.

4. The decree must also require that the injunction contain, mutatis ·mutandis, sections 2, 3, and 4 of the preliminary injunction, and such other provisions as may be necessary and proper to insure, so far as is possible, that there shall be no further unfair competition between the defendant, Walther Mumm von Schwarzenstein as its chairman, and its other officers, agents, and servants, and the plaintiff herein, or any further confusion between the champagnes which are manufactured and imported by the plaintiff and the champagnes—other than champagnes manufactured by the plaintiff—which may hereafter be imported by the defendant under its name as changed or by Walther Mumm von Schwarzenstein as its chairman, or its other officers, agents, and servants.

VIII. If the plaintiff wishes, instead of now submitting a final decree, it may submit an interlocutory decree containing the same provisions as above indicated, and providing also for a reference to a special master to assess any damages which may. have been suffered by the plaintiff by reason of the acts of unfair competition which I have found, as above indicated. But it does not seem to me from the evidence which I have here heard that these damages would be sufficient in amount to warrant the expense of a proceeding before a special master. The costs and disbursements of any reference will follow the event thereof, and any interlocutory decree submitted must so provide.

IX. The final decree herein will carry costs, which must be taxed before the decree is signed, and also a provision that either party may have a right to apply to the court at the foot of the decree, on proper proof, for such modification of the injunction contained in the decree as may seem just to the court if and when such application is made to it. Cf. United States v. Swift & Co., 286 U.S. 106, 114, 115, 52 S.Ct. 460, 76 L.Ed. 999.

Settle decree on five days' notice.