John **ZWACK**, Bela Zwack and Dora
Zwack, as co-partners doing business
under the firm name of J. Zwack & Co.,
Plaintiff,

v.

**KRAUS BROS. & CO., Inc., Defendant.**

United States District Court
S. D. New York.

July 29, 1955.

See, also, 97 F.Supp. 719.

Strasser, Spiegelberg, Fried & Frank, Washington, D. C., George A. Spiegelberg, Peter J. Ryan and H. Peter Stern, New York City, of counsel, for plaintiff.

Wolf, Popper, Ross, Wolf & Jones, New York City, Paul L. Ross and Irving Constant, New York City, of counsel, for defendant.

PALMIERI, District Judge.

This action for an accounting, for damages, and for injunctive relief stems from the nationalization of the plaintiff's enterprise in Hungary by the Hungarian Government. The plaintiff, a Hungarian partnership organized in 1840, has been engaged in the manufacture and distribution of liqueurs and cordials in Hungary and throughout the world. Its principal office has been in Budapest and throughout its history it has been a family enterprise. It has developed an extensive reputation for the excellent quality of its products. They have been marketed both in this country and abroad in bottles of distinctive shape to which were attached labels bearing the inscription "Zwack," "J. Zwack & Co.," "J. Zwack," and "Zwack, J." All of these marks are registered in the United States Patent Office. Other trade names have been used and registered both in the United States Patent Office and in certain states of the United States.

The defendant, a New York corporation, became the plaintiff's exclusive distributing agent for the United States in 1934. The agency agreement was last extended in 1947 for a period expiring in 1960. Subsequent to the events which occurred in Hungary in 1948, and to which reference will be made, the defendant chose to recognize the Hungarian Government as the owner of the plaintiff's enterprise and has continued the importation and sale in the United States of liqueurs and cordials in the same bottles of distinctive shape as before and bearing labels with the plaintiff's trade names.

At an early stage of this litigation, the defendant moved to dismiss the complaint pursuant to the provisions of Rules 12(b) (7) and 19, Federal Rules of Civil Procedure, 28 U.S.C., on the ground that indispensable parties were not joined. The allegedly indispensable parties were Bela Zwack, the owner of a 25% interest and a co-partner, and his wife, Dora (also a co-partner and the owner of a 25% interest), the Hungarian Government, and the "presently existing firm of J. Zwack & Company of Budapest, Hungary." This motion was denied, with an opinion, by Judge Medina, D.C.S.D.N.Y.1950, 93 F.Supp. 963. The remaining co-partner and owner of a 50% interest in the enterprise, John Zwack, appeared upon the trial and testified at length. The allegedly indispensable parties were not, of course, subject to the jurisdiction of the Court, and, as Judge Medina ventured to predict, they have not voluntarily appeared. 93 F. Supp. 963, at page 965. The defendant has, in effect, become the distributing agent for the Hungarian Government; and has vigorously contended for the validity, and recognition by this Court, of all the acts of the Hungarian Government resulting in the nationalization of the plaintiff's enterprise—including those purporting to affect property within the United States. The defendant has relied largely upon documentary evidence and legal argument. Its only witness upon the trial was an expert in Hungarian law.

A brief statement of the factual background of this litigation would seem necessary for a better understanding of the issues involved. The activities of the plaintiff and, at times, its relationship to the defendant, have been frequently affected by the course of political events in Europe since 1938—by the fear of an embargo on Hungarian goods, by the imminence of war, by the fear of the application of the racist laws of the Nazi Government of Germany, and, finally, by

the establishment of the Communist Government of Hungary. Thus, the defendant's attorney in 1939, acting also as attorney for the plaintiff, prepared three agreements between the parties which contemplated the possible boycott of Hungarian products in the United States and the cessation of plaintiff's business activities in Hungary due to war. By these agreements, Tocibra, S. A., a Swiss corporation, organized by Messrs. John and Bela Zwack, then sole partners of plaintiff, was to act for the plaintiff as its agent for distribution of its products in the United States pending stoppage of Hungarian production. The defendant agreed to pay Tocibra, S. A., a commission amounting to 10% of the amounts due from it to plaintiff. Between 1939 and the cessation of shipments after the outbreak of World War II in 1940, the sum of $3,170.12 was set aside by the defendant for the account of Tocibra, S. A., under this arrangement. Tocibra, S. A., having been dissolved in 1948, the amount is now claimed by the plaintiff in this litigation. A larger sum, amounting to $14,514.74, was held by defendant for the account of plaintiff and blocked by the Department of Justice. This, too, having been unblocked on application of Mr. John Zwack in behalf of plaintiff, is also claimed by it.

The admission of Dora Zwack to the partnership by the acquisition of one-half of her husband, Bela Zwack's interest, was motivated by the fear of the occupation of Hungary by the military forces of Germany and of the consequent promulgation of racist laws by an eventual Nazi Government régime. The Messrs. Zwack had good cause to be apprehensive of a repetition of the same consequences that followed the so-called "Anschluss" in neighboring Austria, when that country was incorporated into the German Reich. They believed that the membership of Dora Zwack would afford them some measure of defense against the racist laws which the Messrs. Zwack believed would apply to them. In 1944 and 1945 Budapest was occupied by the military forces first of Germany and

then of Soviet Russia. During this period the plaintiff's business ceased, its factory was largely destroyed and John Zwack went into hiding. Early in 1945 the plaintiff rebuilt the factory, at least in part, and resumed business. As already indicated, the agency contract with the defendant was renewed in 1947. The first shipment to the defendant after the war period occurred in 1948.

It was in that year that a series of events occurred which led to the nationalization of plaintiff's factory and business by the Hungarian Government, without compensation, and under circumstances amounting to coercion and duress. On May 11, 1948, the Hungarian Government adopted a statute nationalizing every industrial enterprise employing more than 100 employees. The plaintiff's enterprise did not come within this classification since it employed less than the stated number of employees. However, the statute was a portent of things to come. The members of the plaintiff partnership were understandably concerned. The Hungarian Government was then dominated by a Communist régime. By December 1949 it was to publish a decree nationalizing all businesses of Hungary with more than ten employees; and this included the plaintiff partnership. Though both the statute of 1948 and the decree of 1949 provided that a statute or decree would subsequently be adopted affording compensation to the nationalized industries, no such statute has ever been passed.

Almost immediately after the passage of the nationalization statute in the early part of 1948, the members of plaintiff partnership were subjected to the fear of political denunciation and possible imprisonment. Mr. John Zwack managed to preserve an uneasy safety by submitting to blackmail and extortion, first at the hands of a Communist Party official and then at the hands of a uniformed excise tax collector. The latter offered to make a favorable report on the company with a view to delaying nationalization on condition that he be paid for it. Finally, and in October 1948, Mr. Bela

Zwack and Mr. Armenius Gordon, a manager of the plaintiff, were summoned to the office of the Alcoholic State Control Monopoly. They were thereupon informed by the head of that office, an official named Grosz, that the Government of Hungary would not tolerate the plaintiff's "known sympathy with industrialists." Strong disapproval was expressed of the plaintiff's allegedly having sent money and formulae out of the country. Grosz ended the meeting by stating that the Hungarian Government would "buy" the plaintiff's factory for between 50,000 to 100,000 forints—the equivalent of $4,500 to $9,000. The factory was worth in its partially repaired condition more than 35 times the price suggested by Grosz as the limit which the Hungarian Government would "pay." The co-partners of the plaintiff were also accused by Grosz of friendship with the family of former Regent Horthy; and Mr. John Zwack was accused of being a representative of the family of Baron Weiss, a prominent businessman. The Messrs. Zwack were considered by Grosz as "politically undesirable." Mr. John Zwack urged his brother, Bela Zwack, and his sister-in-law to adopt an urgent solution. He believed that there was no longer any possibility of saving the enterprise from confiscation and that unless some drastic measures were adopted they faced probable arrest and imprisonment. Mr. John Zwack urged a flight from Hungary as the only possible solution but his brother and sister-in-law were unwilling and warned him of the possible serious consequences not only to themselves but to their employees. Being unable to persuade the others to flee, Mr. John Zwack, torn between the desire to take flight himself and yet to protect those who remained behind, decided to transfer his substantial interest in the enterprise in exchange for a passport. Accordingly, the Zwacks initialed and transmitted to the Hungarian Government an offer to cede their business in return for a job and a used Citroen automobile for Bela Zwack; and a passport for John Zwack. It soon became apparent that the passport would not be issued. When inquiry was made concerning action on the offer the response consisted largely of dilatory excuses. During this period Mr. John Zwack was being warned by a number of persons, including members of the underground, that he was in grave personal danger and that he should flee. Besides, his prior experiences with party and Government officials gave him good cause for alarm. In consequence, on November 18, 1948, Mr. John Zwack fled to Vienna. Thereafter, on November 24, 1948, the Hungarian Government purported to accept the "offer," but it did not tender a passport. Indeed, there can be no question that the purported acceptance of the offer by the Hungarian Government was sham and had no valid consequences.[1]

On December 7, 1948, Mr. John Zwack cabled the defendant from Vienna advising it of his departure from Hungary. On December 23, 1948, he addressed a registered letter to the defendant advising it of the seizure of plaintiff's plant and business and warning the defendant against doing further business with the nationalized Hungarian firm. Almost a year was consumed before Mr. John Zwack was able to procure a visa to enter the United States where he arrived in November 1949. He made immediate

---

1. Judge Medina said, "The acceptance occurred on November 24, 1948; John Zwack had already fled from the country on that date, and his flight withdrew the offer, since it could not be accepted, by its terms, except by the tender of a passport to him. Moreover, even if the offer was still open on the 24th of November, there was a failure of consideration in that this substantial part of the return performance, indeed the only substantial consideration John Zwack was to receive, was not rendered. Finally if by some chance the offer remained open and was accepted, the gross disproportion between the value of the partnership assets and the value of the consideration which the Hungarian Government was to furnish in itself raises serious doubts as to whether the offer was a voluntary one, or was, rather, coerced and therefore of no effect." Zwack v. Kraus Bros. & Co., Inc., 93 F.Supp. 963, at page 966.

demand upon the defendant to turn over to him his firm's frozen assets. The plaintiff obtained a license for payment of the funds in defendant's hands in June 1950, amounting to $17,685.56, but defendant persisted in its refusal to pay. It also demanded that the defendant discontinue the importation of the plaintiff's liqueurs bearing the Zwack name from Hungary. The defendant refused to accede to any of these demands. Moreover, this refusal has been the direct cause of the plaintiff's inability to arrange for the manufacture of Zwack liqueurs and cordials in this country since those who would otherwise be prepared to furnish financial backing are unwilling to do so because of the probability of "buying a lawsuit" as long as the defendant continued his importation of Zwack liqueurs under a claim of right. Shortly after the defendant's refusal and in May 1950 plaintiff initiated this suit in the New York State courts. It was thereafter removed to this court by the defendant on the ground of diversity of citizenship.

Much is made by the defendant of the plaintiff's lack of right to maintain the present action. I do not agree. Judge Medina has already stated that under the Hungarian law Mr. John Zwack is empowered to bring this action on the partnership's behalf to enforce its contractual rights, and the defendant cannot challenge that right. See Zwack v. Kraus Bros. & Co., supra. The proof at the trial before me has amply substantiated this conclusion. The plaintiff's expert witness on Hungarian law testified that under the Hungarian Commercial Code of 1875, the express provisions of the partnership agreement, and in accordance with views expressed by Hungarian text writers and judicial decisions, Mr. John Zwack could maintain the present action on behalf of the plaintiff partnership.

The defendant has stated, "The defendant's position has been that it is under no legal obligation to prove that the Hungarian State carried out its part of the transaction by which it acquired the shares of the partners in the partnership, the firm, J. Zwack & Company, or that the transaction is free of challenge for any reason in Hungary."

This raises the essential issue in the case. The basic defense offered in this case can be stated as follows: Since the Hungarian State has acquired ownership of the partners' shares in the firm J. Zwack & Co., this Court cannot pass upon and determine the validity, propriety or legality of the acts of the sovereign by which ownership was acquired. I agree that I must accept as valid the basic premise that the conduct of a foreign sovereign is a political question which can only be examined by the Executive branch of our Government. This has been established doctrine at least since the often-quoted opinion of the Supreme Court in Underhill v. Hernandez, 1897, 168 U.S. 250, at page 252, 18 S.Ct. 83, at page 84, 42 L.Ed. 456, wherein Mr. Justice Fuller stated:

> "Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory. * * *"

See also Earn Line S. S. Co. v. Sutherland S. S. Co., Ltd., D.C.S.D.N.Y.1918, 254 F. 126, 129, affirmed sub nom The Claveresk, 2 Cir., 1920, 264 F. 276. The English courts have applied the same doctrine in cases involving title to property confiscated by the Russian Government. A. M. Luther v. James Sagor & Co., [1921] 3 K.B. 532, 555–557, cited with approval in United States v. Belmont, 1937, 301 U.S. 324, 328, 57 S.Ct. 758, 81 L.Ed. 1134, and Guaranty Trust Co. of New York v. United States, 1938, 304 U.S. 126, 140, 58 S.Ct. 785, 82 L.Ed. 1224; Princess Paley Olga v. Weisz, [1929] 1 K.B. 718. Cf. Anglo-Iranian Oil Co., Ltd. v. Jaffrate, [1953] 1 W.L.R. 246. Regardless of any limitations which may exist with respect to this doctrine, it still is true, under the weight of binding decisions, that foreign confisca-

tion decrees will not be reviewed by our courts with respect to property located within the confiscating country. Bernstein v. Van Heyghen Freres S. A., 2 Cir., 163 F.2d 246, 249, certiorari denied, 1947, 332 U.S. 772, 68 S.Ct. 88, 92 L.Ed. 357; Kuerschner & Rauchwarenfabrik, A. G. v. New York Trust Co., D.C.S.D. N.Y.1954, 126 F.Supp. 684, 689; Vladikavkazsky Railway Co. v. New York Trust Co., 1934, 263 N.Y. 369, 189 N.E. 456, 91 A.L.R. 1426; Frazier v. Foreign Bondholders Protective Council, Inc., 1st Dept. 1953, 283 App.Div. 44, 125 N.Y.S.2d 900.

■■■ I am well aware that the immunity from judicial review upon which the defendant so strenuously relies in this case and which has been often referred to as the "Rule of Decision" principle or "Act of State" doctrine, pursuant to which the courts of one country are bound to abstain from sitting in judgment on the acts of another government done within its own territory, is a firmly entrenched principle,[2] and has often resulted in sheltering foreign acts of confiscation, where the confiscated property at the time of the litigation was in the territory of the forum; see Oetjen v. Central Leather Co., 1918, 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726; and where the victim of the confiscation was a national of the forum, see Ricaud v. American Metal Co., Ltd., 1918, 246 U.S. 304, 38 S.Ct. 312, 62 L.Ed. 733. One careful scholar has come to the conclusion that the "Rule of Decision" principle, even when limited to its proper sphere, has earned a well deserved rest. See Re, Foreign Confiscations in Anglo-American Law 170 (1951). This principle, however, does not apply to the confiscatory acts of foreign governments when those acts purport to affect property which was not within the territorial jurisdiction of that government, unless a national policy of the United States Government requires that extraterritorial

effect be given. United States v. Pink, 1942, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796; see, also, Anderson v. N. V. Transandane Handelmaatschappij, N.Y.Sup. Ct.1941, 28 N.Y.S.2d 547, affirmed 1st Dept. 1941, 263 App.Div. 705, 31 N.Y.S. 2d 194, affirmed 1942, 289 N.Y. 9, 43 N.E. 2d 502. That is the situation presented here. Since the property here involved was at all times within the United States and no national policy has been suggested which would require this Court to give extraterritorial effect to the confiscation by the Hungarian Government, the way is clear to provide relief for the plaintiff. Banco de Vizcaya v. Don Alfonso de Borbon y Austria, [1935] 1 K.B. 140; Plesch v. Banque Nationale de la Republique D'Haiti, 1st Dept., 273 App. Div. 224, 77 N.Y.S.2d 43, affirmed 1948, 298 N.Y. 573, 81 N.E.2d 106; Restatement, Conflict of Laws § 612 (1934).

If further authority were needed to afford relief to the plaintiff in this case, it can be found in Baglin v. Cusenier Co., 1911, 221 U.S. 580, 31 S.Ct. 669, 55 L.Ed. 863, which provides a rather striking factual counterpart to the case here. The plaintiff, Father Baglin, was Superior General of the Order of Carthusian Monks. For several hundred years, except for a brief period following the French Revolution, the Order had occupied its Mother House, the Monastery of the Grande Chartreuse near Voiron, in the Department of Isere, in France. By a secret process they made a liqueur which became extensively traded in and known throughout the world as "Chartreuse." It was marketed in France and throughout the world in bottles of distinctive shape to which were attached labels bearing distinctive inscriptions. In 1903, the Order was dissolved and their property seized by the French Government pursuant to a law known as the Associations Act. The Monks went to Tarragona, Spain, taking their secret with them, and they there continued to pro-

---

2. 2 Moore, A Digest of International Law, 30–32 (1906); Holdsworth, The History of Acts of State in English Law, 41 Columbia Law Review 1313 (1941); Mann, The Sacrosanctity of the Foreign Act of State, 59 L.Q.Rev. 42, 155 (1943); Comment, 57 Yale Law Journal 108 (1947).

duce the liqueur. The French "Sequestrating Administrator and Liquidator" undertook to make a liqueur resembling as closely as possible the well known "Chartreuse" and, having succeeded to his satisfaction, he placed his product upon the market under the old name. The defendant, the agent for the French Liquidator, undertook to trade in this liqueur in the United States. Prior to the confiscation of the plaintiff's property in France, the Monastic Order had registered trade-marks in this country protecting the word "Chartreuse" as well as certain other words appearing on their labels. There was no question that the liqueur sought to be marketed by the agent of the French Liquidator simulated in every way the product of the the plaintiff, including the label and the inscription previously used by the plaintiff. The Court held that the defendant had been guilty of unfair competition and infringement. In its decree the Court perpetually enjoined the defendant and its successors from using the trade-mark "Chartreuse" or any colorable imitation thereof or the facsimile of the inscriptions on the label. In effect, the defendant was not permitted to engage in competition with the plaintiff in this country so long as it identified its products with those of the plaintiff. In the course of its opinion the Court stated:

> "The Monks were enabled to continue their business because they still have the process, and continuing it they enjoyed all the rights pertaining to it, save to the extent to which, by force of the local law, they were deprived of that enjoyment in France." Baglin v. Cusenier Co., supra, 221 U.S. at page 597, 31 S.Ct. at page 674.

An English Court in a case involving substantially the same issues reached the same result, although it relied in part upon the fact that the French Associations Act, by which the property of the Monastic Order was confiscated, was penal in nature. See Lecouturier v. Rey, [1910] A.C. 262.

The defendant here relies upon Societe Vinicole de Champagne v. Mumm Champagne & Importation Co., Inc., D.C.S.D. N.Y.1935, 10 F.Supp. 289, Id., D.C., 13 F.Supp. 575, and suggests that this case should lead to a different result. I cannot agree because I consider it to be distinguishable from the case at bar. I think it is clear that the Court in that case relied upon previous decisions of the Mixed Franco-German Tribunal, see 13 F.Supp. at page 594, which, in turn, were based on construction of the language of the Treaty of Versailles. There is no such compelling background in this case. Moreover, to the extent that Societe Vinicole de Champagne v. Mumm Champagne & Importation Co., Inc., supra, can be deemed to be in conflict with Baglin v. Cusenier Co., supra, I do not regard it as binding authority.

■ I turn now to the admissibility of certain documents offered by the defendant upon the trial. They purport to show that substantial surplus profits taxes, retroactively levied, were due and owing to the Hungarian Government (Exhibit YY); and that they were subsequently remitted as "counter-value" for the plaintiff's "cession" of its enterprise to the Hungarian Government (Exhibit WW). I should point out, parenthetically, that in pressing the offer of these exhibits the defendant is taking a position inconsistent with its basic argument in the case—that the Hungarian Government lawfully acquired the plaintiff's business by the acceptance of the offer already referred to. This offer, dated November 9, 1948 (Plaintiff's Exhibit 14), is set forth in full and in writing and includes a statement to the effect that the total of debt owed by the plaintiff partnership did not exceed 10,-000 forints, the equivalent of $950. Moreover, there is credible testimony given by Mr. John Zwack to the effect that his firm owed no taxes of any kind when he fled Hungary in 1948. The defendant cannot both affirm and disaffirm the offer it claims the Hungarian Government accepted. The attempt by the defendant to set up the alleged surplus

profits taxes amounting to 865,888.65 forints, levied in 1950 for the period January 1, 1947, to October 31, 1948, as part of the "counter-value" for the transfer of the plaintiff's firm, impresses me as a form of bookkeeping legerdemain and contrary to the defendant's position that the so-called cession of the plaintiff's business to the Hungarian Government resulted from its acceptance of the offer. Nor can these retroactively levied and subsequently remitted taxes transform the nationalization of the plaintiff's enterprise by the Hungarian Government from an act of confiscation into one of expropriation or one of purchase. Furthermore, I cannot regard these documents as admissible because, although they purport to be *ex parte* statements by Hungarian public officials, and assuming arguendo that they can be considered "official records" within the meaning of Rule 44 of the Federal Rules of Civil Procedure, they do not constitute proof of the truth of their contents. See United States v. International Harvester Co., 1927, 274 U.S. 693, 703, 47 S.Ct. 748, 71 L.Ed. 1302; Vanadium Corporation of America v. Fidelity & Deposit Co. of Maryland, 2 Cir., 1947, 159 F.2d 105.

█ The defendant also relies upon a series of exhibits consisting of communications and statements signed by Bela or Dora Zwack, or both. They purport to show that the plaintiff's business was "spontaneously offered" to the Hungarian Government and they castigate Mr. John Zwack for being the proponent of this lawsuit. The plaintiff has conceded that these various exhibits are admissible in evidence but it contends that they should be given no weight. I think the plaintiff is correct. These documents are palpable manifestations of coercion and duress and cannot be relied upon as having any testimonial trustworthiness. See 3 Wigmore, Evidence, §§ 766, 815 (3d Ed. 1940). A brief quotation from Exhibit U, a letter addressed to the defendant by Bela Zwack under date of December 14, 1948, is sufficient to illustrate what I mean:

"At the beginning of November my younger brother[3] declared that being unable to obtain a legal passport, he intends leaving the country on an illegal way and he invited me to do so too and to leave the country together with him. I was not inclined to do so, for it was distinctly present to my mind that in the case of our leaving the country in an illegal way the leading clerks who during decenniums were our honest collaborators would get into an awful predicament. * * * So we could not find but the one solution to offer the factory spontaneously to the State without any material equivalent on the one condition that my younger brother ought to obtain a passport with which he leaves the country * * *."

The last sentence of the excerpt quoted indicates with impressive eloquence that the Zwack family were at a loss to save their enterprise and were attempting desperately to save themselves and their employees, even if it meant parting with their factory "without any material equivalent" in exchange for one passport for Mr. John Zwack. Here was a very substantial property on the point of being sacrificed—and we are dealing with businessmen who had conducted their affairs with marked success for many years. It would strain credulity to believe that they would thus part with the factory, which was the very heart of their enterprise, under such circumstances, unless they were driven to this extreme by coercion and duress. I have no doubt that the two Zwack partners who remained in Hungary became in a literal sense captive partners of the nationalized enterprise. That they chose to remain as "captives" makes the situation more pathetic, but does not change their declarations into those of free individuals. The reference by Bela Zwack to a "spontaneous offer" of the business to the Hungarian Government has a ring of bitter irony. In the light of all of the surrounding circumstances testified

---

**3.** The reference is to Mr. John Zwack.

to upon the trial by Mr. John Zwack, and of the very terms of Exhibit U, it can be considered as anything but "spontaneous."

It is worthy of note that Exhibit U, the letter of Mr. Bela Zwack from which I have just quoted, makes no mention of any taxes being due to the Government at the time of the "spontaneous offer" and would seem, therefore, to impugn the documents to which I have already referred (Exhibits YY and WW) whereby the defendant purports to show a remission of surplus profits retroactively taxed as a basis for lawful acquisition by the Hungarian Government.

In conclusion, it is my opinion that defendant's Exhibits R, S, U, FF, GG, HH and II clearly reflect a state of fear on the part of Bela and Dora Zwack and cannot, therefore, possess testimonial value.

We come now, lastly, to the moneys admittedly belonging to the plaintiff, held by the defendant for the account of the plaintiff, and blocked by acts of the Executive department of the United States Government. Counsel for the defendant conceded upon the trial that they were assets with a situs in the United States and that therefore this Court had jurisdiction to deal with them. The Foreign Fund section of the Department of Justice authorized the payment of these sums in 1950 upon the application of Mr. John Zwack, and I see no reason why the defendant is entitled to withhold them from the plaintiff.

The defense of laches cannot be sustained because the plaintiff has sought vigorously and continuously, ever since the flight of John Zwack from Hungary, to protect the legitimate interests of the partnership in this country,

In affording the plaintiff injunctive relief, I recognize the defendant's right to deal in the liqueurs and cordials imported from Hungary, provided such activity causes no injury to the plaintiff in the United States, or in any of its possessions, by the improper use or simulation of the plaintiff's trademarks, labels or distinctive bottle shapes, or by unfair competition with the plaintiff's enterprise in this country.

I am filing Findings of Fact and Conclusions of Law herewith. The plaintiff is directed to submit a form of decree on notice.