F. PALICIO y COMPANIA, S. A., Cifuentes y Compania, Por Larranaga, S. A., Menendez, Garcia y Compania, Limitada, and Tabacalera Jose L. Piedra, S. A., Plaintiffs,

v.

Gilbert P. BRUSH and Monroe Percy Bloch, co-partners doing business under the firm name and style of Brush & Bloch, Defendants.

No. 61 Civ. 2299.

United States District Court
S. D. New York.

July 27, 1966.

As Amended Sept. 21, 1966.

Rabinowitz & Boudin, New York City, for plaintiffs. Victor Rabinowitz, Leonard B. Boudin, Henry Winestine, New York City, of counsel.

Brush & Bloch, New York City, in pro. per. Monroe Percy Bloch, Jac M. Wolff, New York City, of counsel.

## OPINION

FREDERICK van PELT BRYAN, District Judge:

The controversy which is the subject of this action arises out of the take-over by the Castro government of Cuba of five leading Cuban manufacturers of cigars whose businesses and principal assets were located in that country. Basically the dispute involves the respective rights of the "interventors" who took possession of the businesses and assets of these manufacturers on behalf of the Cuban government and the dispossessed former owners to pursue in this court suits for the purchase price of Cuban cigars sold and delivered to United States importers by the interventors and for trademark infringement.

This action is brought in the name of the five intervened Cuban business entities by Messrs. Rabinowitz & Boudin, a New York law firm who, as attorneys for the interventors, are acting for the Cuban government. Three of the named plaintiffs so intervened, F. Palicio y Compania, S. A., Tabacalera Jose L. Piedra, S. A., and Por Larranaga, S. A., are corporations organized and existing under Cuban law. Another, Cifuentes y Compania, is a Cuban partnership. The fifth, Menendez, is an entity unfamiliar to American law and is designated a "limited liability company" or a "limited partnership" under Cuban law. At the time of the take-over substantially all of the stockholders, officers and directors of the three corporations, the partners of the partnership and the partners or owners of the limited liability company were Cuban citizens residing in that country. None were American citizens.

The defendants are the New York law firm of Brush & Bloch, who have been retained by the former owners of the five Cuban business entities and have brought eleven actions in this court in the name of those entities to recover for the purchase price or value of Cuban cigars sold and delivered to United States importers by the interventors after the take-over and for alleged trademark infringement.

The action at bar seeks (1) an injunction against Brush & Bloch restraining them from prosecuting the eleven actions which they commenced in this court in the name of the plaintiffs, and (2) an order directing that attorneys for the interventors (presumably Rabinowitz & Boudin) be substituted as counsel for plaintiffs in those eleven actions.

■ Messrs. Rabinowitz & Boudin, representing the interventors, have moved for summary judgment. Rule 56 (a), F.R.Civ.P. Defendants Messrs. Brush & Bloch have moved pursuant to Rule 12(b), F.R.Civ.P., to dismiss the action on a variety of grounds. Since the defendants' motion is supported by affidavits and a joint stipulation of facts has been submitted, the motion will likewise be treated as one for summary judgment. Rules 12(c), 56(b), F.R.Civ.P.

### Facts

The facts as stipulated by the parties are as follows:

Prior to September 15, 1960 the five Cuban entities with which we are concerned here manufactured cigars and other tobacco products in Cuba and sold their products in the United States and elsewhere. The cigars manufactured were of high and distinctive quality and reputation and for many years the products, which bore trademarks registered in the United States Patent Office, Cuba and other countries, had been identified with the respective entities.

On September 15, 1960, however, the Castro government of Cuba, acting under Cuban law, took possession of the businesses and assets in Cuba of each of the entities and ousted the owners and those who had managed and controlled the enterprises on their behalf. The Cuban government designated so-called "interventors" for each of the entities, who assumed possession and control and actually operated the businesses thereafter on be-

half of the government.[1] Under "intervention" procedure the intervenor is vested with complete possession and control of a business enterprise to the exclusion of the officers, directors, shareholders, partners or other persons who would otherwise manage and conduct it.[2] Though intervention does not appear to effectuate a formal transfer of title from the former owners and managers to the governmental authorities, the end result is indistinguishable in practical effect from complete confiscation—for almost six years the former owners have been ousted without their consent from all the properties and excluded from any participation in the businesses. Their rights to any receipts and profits have been eliminated. No compensation has been provided.

The intervention of four of the entities has remained in effect from September 15, 1960 until the present. The fifth entity—Cifuentes—was nationalized on June 29, 1961 by resolution of the Cuban Central Planning Board.

Subsequent to the take-overs the interventors, acting on behalf of the Cuban government, continued to manufacture cigars in the Cuban plants which they had taken over and to sell the products under the same names and trademarks to various importers in the United States, including Faber, Coe & Gregg, Alfred Dunhill of London, Dunhill International, Inc. and Saks & Co. These importers accepted and retained the cigars shipped by the interventors but, no doubt apprehensive of double liability, failed to pay the purchase price. The amounts due for the cigars so shipped eventually aggregated some $570,000, consisting of trade acceptances in the amount of $196,000, held by the interventors in Cuba and the balance on open account.[3] With limited exceptions not here material all of the amounts due from the various importers are for cigars shipped by the interventors subsequent to the take-overs.

When the interventors failed to receive payment for the cigars which they had shipped, beginning in April 1961 all exportation of Cuban cigars was funneled through a newly formed entity "Empresa Cubana de Exportaciones," an instrumentality of the Cuban government. A New York corporation, R. C. W. Supervisor, Inc., was organized as the sole United States importer of Cuban cigars. It carried on that business until February 6, 1962, when Presidential Proclamation 3447, 27 Fed. Reg. 1085, brought about the cessation of commercial intercourse between the United States and Cuba.

Following the interventions of September 15, 1960, the former owners of the five Cuban entities retained Messrs. Brush & Block to represent their interests. These attorneys initiated nine actions in this court in the names of the respective entities on behalf of their original owners against the various importers who had not paid the purchase price of the cigars (1) for an injunction restraining them from infringing plaintiffs' United States trademarks and from paying to anyone else the price of goods belonging to plaintiffs, originating from their plants or bearing their United States trademarks; (2) for an accounting, damages and any sums found to be due to the plaintiffs; and (3) for the

---

1. The "interventions" were authorized by Cuban Law No. 647, November 24, 1959, as amended by Law No. 843, July 6, 1960. The five enterprises were actually intervened by Resolution No. 20260, issued by Augusta R. Martinez Sanchez, Minister of Labor, on September 15, 1960.

2. According to Cuban Law No. 647, supra note 1: "[t]he 'Interventors' designated hereunder shall be vested with all the powers required to manage and direct the concern or enterprise (work center) cov-

ered by the respective seizure resolution, and all the authority regularly exercised by the executives; wherefore they shall be subrogated to the standing, powers and privileges of the respective employer, without thereby precluding the specification * * * of the scope of the functions and authority of the latter."

3. An additional $105,000 due at the commencement of this action has been paid by Faber, Coe & Gregg to creditors of the Cuban firms pursuant to the stipulation of the parties.

purchase price or value of cigars bearing plaintiffs' trademarks and shipped from their plants in Cuba. Messrs. Brush & Bloch also commenced an action in the names of all five entities seeking the same relief against R. C. W. Supervisor, Inc., R. C. Wood Imported Cigars, Inc. and Robert C. Wood, who apparently had paid the interventors for the cigars shipped to them. The eleventh action was commenced by Brush & Bloch in the name of Tabacalera and sought similar relief against R. C. Wood Imported Cigars, Inc., which also had paid for cigars which the interventors had shipped from the intervened Tabacalera plants. In the last two actions Messrs. Rabinowitz & Boudin who brought the present action in the names of the Cuban entities are attorneys for the defendants.

The ultimate issue raised here—whether the interventors or the former owners of the five Cuban entities are entitled to control the eleven actions against the importers and receive any proceeds and benefits which may be recovered—plainly turns upon the legal effect of the interventions.

### I.

■ At the outset it is clear that this action in the nature of a plenary proceeding challenging the authority of the defendant attorneys to represent the plaintiffs in eleven other actions in this court is an appropriate vehicle for determining that ultimate issue.

■ At any stage of a case the court has inherent power to make inquiry as to the authority of an attorney to represent a litigant. E. g., Pueblo of Santa Rosa v. Fall, 273 U.S. 315, 47 S.Ct. 361, 71 L.Ed. 658 (1927); In re Retail Chemists Corp., 66 F.2d 605 (2 Cir. 1933); Sutherland v. International Ins. Co., 43 F.2d 969 (2 Cir. 1930). This question, usually raised by motion in the action, may, and often does, go to the very heart of the controversy being litigated. It may, as here, affect the right of the litigant to assert the claim which he is pressing and to recover the proceeds of the action. Pueblo of Santa Rosa v. Fall, supra.

■ There is no doubt that an attorney's authority depends upon the consent of the client who may dismiss his attorney at any time, with or without cause, and retain a new one. E. g., Doggett v. Deauville Corp., 148 F.2d 881 (5 Cir. 1945); Gangewere v. Bernstein, 199 F. Supp. 38 (S.D.N.Y.1961).

However, the issue in the case at bar is somewhat different. Here there is no question that the Cuban government has authorized the interventors to act on behalf of the five Cuban entities,[4] and that Messrs. Rabinowitz & Boudin have been duly retained to represent the interventors. There is likewise no question as to the retainer of Messrs. Brush & Bloch by the original owners. The issue raised in this plenary action is whether the grant of authority by the Cuban government to the interventors—and consequent dispossession of the former owners—perforce establishes that Brush & Bloch are no longer authorized to enforce on behalf of the five entities the various claims which are the subject of the eleven actions pending in this court.

I see no reason why questions of such major import to the parties and involving their substantial rights may not be litigated in a separate plenary action such as this where the court can determine and declare the respective rights of the parties and make such directions as may be necessary to implement them. Under similar circumstances such an action was held proper in Mann v. Compania Petrolera Trans-Cuba, 32 Misc.2d 790, 223 N.Y.S.2d 900 (1962).

The procedure followed here furnishes an expeditious and convenient means of securing the determination of the ultimate questions necessarily involved in

---

4. In addition to the broad grant of powers vested in the interventors by Cuban Law No. 647, supra note 2, Resolution 20260— which intervened all the plaintiffs— specifically bestowed authority upon them "to represent the Enterprises legally in and outside of court."

this case. The interests of orderly judicial administration would not be served by requiring the interventors to move to intervene in each of the eleven actions now pending or to institute separate suits against the importers. In short, the present action is a sound vehicle for expeditiously determining basic issues of great importance to the parties involved with a minimum of inconvenience to those parties and to the court.

Sundry objections raised by the defendants to the effect that under well-settled principles an attorney cannot represent conflicting interests and that therefore the relief sought here should be denied, quite miss the point of this litigation. There is no doubt that the former owners of the five entities may enforce any rights which they have through the attorneys of their own choice, Messrs. Brush & Bloch. Nor is there any question that the interventors may retain Messrs. Rabinowitz & Boudin to enforce any rights which they have. The issue here, however, is not what counsel the respective parties can retain but what rights the competing claimants can enforce through the attorneys of their choice in the eleven pending actions.

As pointed out, the ultimate resolution of this question turns upon the legal effect of the intervention by the government of Cuba of the five entities who are named as plaintiffs.

## II.

■ Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L. Ed.2d 804 (1964) held in essence that (1) instrumentalities of the present Cuban government may not be denied access to American courts because Cuba is an unfriendly power which does not permit nationals of this country to obtain relief in its courts; (2) a suit based on a public law of the Cuban government which has been fully executed within Cuba is cognizable in the courts of this country; (3) in suits in American courts by instrumentalities of the Cuban government the act of state doctrine [5] applies, even though such acts may have been in violation of international law; and (4) the act of state doctrine proscribes a challenge to the validity of Cuban expropriation decrees in a suit by an instrumentality of the Cuban government to recover the proceeds of a sale of goods expropriated in Cuba under such decree.

■ It is plain that the decrees of intervention or nationalization involved in this case are prototypes of acts of state to which the act of state doctrine applies. See Restatement (Second), Foreign Relations Law of the United States § 41, comment *d* (1965). Were the holding of *Sabbatino* still in full force and effect defendants do not seriously question that the act of state doctrine would apply here.

However, defendants urge that insofar as *Sabbatino* requires the application of the act of state doctrine it is no longer the law because its holding was overruled or invalidated by the Hickenlooper amendment to the Foreign Assistance Act of 1964, 22 U.S.C. § 2370(e) (2), which I held to be valid and effective in Banco Nacional de Cuba v. Farr, 243 F.Supp. 957 (S.D.N.Y.1965). In the Hickenlooper amendment Congress fashioned an exception to the doctrine in cases of a confiscation or other taking after January 1, 1959 by an act of a foreign state "in violation of the principles of international law, including the principles of compensation." The amendment provided that "[n]otwithstanding any other provision of law, no court in the United States shall decline on the ground of the federal act of state doctrine to make a determination on the merits giving effect to the principles of international law in a case in which a claim of title or other

5. According to the traditional statement of the rule "[e]very sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory." Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 416, 84 S.Ct. 923, 934 (1964), quoting Underhill v. Hernandez, 168 U.S. 250, 252, 18 S.Ct. 83, 42 L.Ed. 456 (1897).

right to property is asserted by any party including a foreign state * * * based upon (or traced through)" such a confiscation or taking. The amendment, however, also specifically stated that it should be inapplicable "in any case in which an act of a foreign state is not contrary to international law." Thus, under the amendment if the act of taking by the Cuban government was in violation of international law this court is no longer proscribed from challenging the validity of the Cuban expropriation decrees but is required to decide the case on the merits giving effect to international law principles.

The defendants strenuously urge that the Cuban decrees in this case under which the interventors took possession of the businesses and assets in Cuba of the five Cuban entities with which we are concerned were "in violation of the principles of international law," and that this court must therefore find against the interventors on the merits.

■■ However, it is settled doctrine that "acts of a state directed against its own nationals do not give rise to questions of international law." Banco Nacional de Cuba v. Sabbatino, 307 F.2d 845, 861 (2 Cir. 1962), rev'd on other grounds, 376 U.S. 398, 84 S.Ct. 923 (1964); see, e. g., Zander, The Act of State Doctrine, 53 Am.J.Int'l Law 826, 836 (1959). Thus confiscations by a state of the property of its own nationals, no matter how flagrant and regardless of whether compensation has been provided, do not constitute violations of international law. See United States v. Belmont, 301 U.S. 324, 332, 57 S.Ct. 758, 81 L.Ed. 1134 (1937); Pons v. Republic of Cuba, 111 U.S.App.D.C. 141, 294 F.2d 925 (1961), cert. den., 368 U.S. 960, 82 S.Ct. 406, 7 L.Ed.2d 392 (1962); M. Salimoff & Co. v. Standard Oil Co., 262 N.Y. 220, 186 N.E. 679, 89 A.L.R. 345 (1933); Luther v. James Sagor & Co., [1921] 3 K.B. 532. "This is true even if the property affected by the foreign act of state is later brought into the United States." Reeves, The Act of State—Foreign Decisions Cited in the *Sabbatino* Case: A Rebuttal and Memorandum of Law, 33 Ford.L.Rev. 599, 611 (1965), citing Ricaud v. American Metal Co., 246 U.S. 304, 309–310, 38 S.Ct. 312, 62 L.Ed. 733 (1918); see Eastern States Petroleum Co. v. Asiatic Petroleum Corp., 28 F.Supp. 279, 281 (S.D.N.Y.1939).

■ In this case all of the five entities which were intervened by the Cuban government were Cuban business entities, organized under Cuban law and doing business in Cuba. Their plants and assets were on Cuban soil and their operations were conducted there. Substantially all of the shareholders and other owners and the officers and directors were Cuban citizens residing in Cuba at the time of the intervention. None was a citizen of the United States.

Thus, the acts of state of the Cuban government which took over the assets and property of the five Cuban entities were not "in violation of the principles of international law." Though the takings took place after January 1, 1959 they come not within the purview of the Hickenlooper amendment but rather within the specific exception excluding application of the amendment "in any case in which an act of a foreign state is not contrary to international law."

Except insofar as the validity of the *Sabbatino* decision has been overruled by the Hickenlooper amendment it is still valid and controlling. Under *Sabbatino* the act of state doctrine is plainly applicable here and proscribes this court from questioning the validity of the Cuban decrees by which the property of the five Cuban entities was intervened by the Cuban government.

### III.

■ It does not necessarily follow, however, that the act of state doctrine is dispositive of this case. For "when property confiscated is within the United States at the time of the attempted confiscation, our courts will give effect to acts of state 'only if they are consistent with the policy and law of the United States.'" Republic of Iraq v. First Nat'l City Bank, 353 F.2d 47, 51

(2 Cir. 1965), quoting Restatement, Foreign Relations Law of the United States § 46 (P.O.D.1962). In the language of the cases our courts will not give "extraterritorial effect" to a confiscatory decree of a foreign state, even where directed against its own nationals. E. g., Zwack v. Kraus Bros. & Co., 93 F.Supp. 963, 966 (S.D.N.Y.1954), aff'd, 237 F.2d 255, 259 (2 Cir. 1956); Blanco v. Pan-American Life Ins. Co., 221 F.Supp. 219, 227 (S.D.Fla.1963); Compania Ron Bacardi, S. A. v. Bank of Nova Scotia, 193 F.Supp. 814, 815 (S.D.N.Y.1961); Naamloze Vennootschap Suikerfabriek "Wono-Aseh" v. Chase Nat'l Bank, 111 F. Supp. 833, 841 (S.D.N.Y.1953) (Kaufman, J.). Accordingly, "foreign confiscatory decrees purporting to divest nationals and corporations of the foreign sovereign of property located in the United States uniformly have been denied effect in our courts * * *." Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 447, 84 S.Ct. 923, 950 (1964), (White, J., dissenting), citing inter alia, Moscow Fire Ins. Co. of Moscow, Russia v. Bank of New York & Trust Co., 280 N.Y. 286, 20 N.E.2d 758 (1939), aff'd by an equally divided court sub nom. United States v. Moscow Fire Ins. Co., 309 U.S. 624, 60 S.Ct. 725, 84 L.Ed. 986 (1940); Vladikavkazsky R. R. v. New York Trust Co., 263 N.Y. 369, 189 N.E. 456 (1934). The application of this principle raises the significant questions here.

Acts of intervention and nationalization which do not afford compensation to the persons adversely affected are undoubtedly inconsistent with our policy and laws. E.g., U.S.Const., Amend. V; Republic of Iraq v. First Nat'l City Bank, 353 F.2d 47 (2 Cir. 1965). The failure to deprive the owners of technical title by the decrees of intervention is of no significance in this case.[6]

As was said in Zwack v. Kraus Bros. & Co., 237 F.2d 255, 259 (2 Cir. 1956):

"where firm assets existing in the forum are concerned, technical considerations as to the manner in which the foreign state seeks to expropriate them are not controlling * * *. It is clear that the [foreign] government could not directly seize the assets which have a situs in the state of the forum. To allow it to do so indirectly through confiscation of firm ownership would be to give its decree extraterritorial effect and thereby emasculate the public policy of the forum against confiscation."

Realistically viewed, then, the Cuban decrees have deprived the five plaintiffs of their property contrary to our policy against confiscation without compensation. The question for decision here is whether any of the "property confiscated [was] within the United States at the time of the attempted confiscation." Republic of Iraq v. First Nat'l City Bank, 353 F.2d 47, 51 (2 Cir. 1965). This is an issue of federal law since the "exercise of discretion" whether or not to ascribe a United States situs to property affected by a foreign act of state "is closely tied to our foreign affairs, with consequent need for nationwide uniformity." Id. at 50.

## IV.

The primary concern of the interventors in this action is the debts due by way of accounts receivable and trade acceptances for cigars shipped to the importers who are defendants in the actions brought by Brush & Bloch on behalf of the former owners. The interventors do not assert any claims for trademark infringement and, indeed, could not well do so since it was they who shipped the cigars under the customary trademarks.

I turn then to the question of whether the interventors or the former owners

---

6. See Mann v. Compania Petrolera Trans-Cuba, 32 Misc.2d 790, 223 N.Y.S.2d 900 (1962); cf. Smith v. Illinois Bell Tel. Co., 270 U.S. 587, 46 S.Ct. 408, 70 L.Ed. 747 (1926). See also Falk, The Aftermath of Sabbatino 43–44 (1965); Reeves, The Act of State-Foreign Decisions Cited in the Sabbatino Case: A Rebuttal and Memorandum of Law, 33 Ford.L.Rev. 599, 611–13 (1965).

are entitled to sue and recover for the debts due for the cigars.

■ On September 15, 1960, all the physical assets of the five entities in Cuba, including the plants and inventory of cigars and tobacco, were taken over by the Cuban government. As in *Sabbatino*, the property physically in Cuba "was expropriated rather than a contractual claim." 376 U.S. at 413, 84 S.Ct. at 932. The interventors, from then on in possession and control of the five entities, continued the manufacture of cigars in the seized plants from the tobacco on hand and no doubt such other tobacco as had to be procured.[7] They subsequently sold the finished cigars to the United States importers who have not yet paid for them. For purposes of this case the interventors are claiming only the price of cigars shipped after the intervention.[8]

Viewed in these terms the situs of the debts due from Faber, Coe & Gregg, Dunhill and Saks & Co. is quite immaterial. These obligations accrued by reason of sales completed after plaintiffs had been intervened. No debts were in existence at the time of the intervention. In short, the take-overs were fully executed under Cuban law before the trade acceptances and other obligations involved in this dispute arose.

Under these circumstances the act of state doctrine operates to prevent this court from questioning the validity of acts of seizure by the Cuban government of tangible physical property located in Cuba. I am compelled to refrain from examining the validity of these seizures for the strong policy reasons so fully stated by Mr. Justice Harlan in *Sabbatino*, and indeed, insofar as seizure of the physical property located in Cuba is concerned, by Mr. Justice White in his *Sabbatino* dissent. 376 U.S. at 445–447, 84 S.Ct. 923.

■ Accordingly, it is plain that the debts due for the price of cigars shipped after the interventions are owing to the interventors and not to the former owners who have been dispossessed of their property. The Cuban government has unequivocally directed that the interventors are empowered to sue to recover these obligations on behalf of the five plaintiffs, and this court may not question the validity of that decree.

■ It is true that by permitting the Cuban interventors to sue on the debts due them for confiscated property shipped to the United States this court in effect is implementing and enforcing confiscatory decrees which are abhorrent to our own policy and laws. Though the arguments against such a result are not unimpressive,[9] the issue is closed in this court. *Sabbatino* specifically rejected the contention that the act of state doctrine should apply only when it is invoked by way of defense and not affirmatively in aid of recovery. 376 U.S. at 437–438, 84 S.Ct. 923. It held that the doctrine must be applied even where the confiscating government or its instrumentality is the plaintiff in a suit to recover the proceeds of property seized under its own confiscatory decree. No matter how the issue of the validity of the decree of a foreign government expropriating physical property of its own citizens within its own boundaries may arise in the vicissitudes of litigation the act of state doctrine must be applied. Cf. Black-Clawson Co., etc. v. International Ass'n of

---

7. In an affidavit presented more than two months after the final stipulation of facts was filed with the court the former owners maintain that all the cigars had already been manufactured at the time of the seizures. The interventors refused to stipulate this fact and it is in dispute. Even were it established, however, it would be immaterial.

8. In order to avoid confusing the issues the intervenor has expressed willingness to turn over to the defendants the small sum representing "the price of cigars shipped prior to intervention," provided the court rule in plaintiffs' favor with respect to the balance. Reply Brief for Plaintiff, p. 7.

9. See Collinson, Sabbatino: The Treatment of International Law in United States Courts, 3 Colum.J.Transnat'l L. 27, 51–54 (1964).

Machinists, 313 F.2d 179 (2 Cir. 1962).[10] The result is that the interventors and not the former owners may sue for the debts due which are the subject of the eleven actions pending against American importers of Cuban cigars and are entitled to any recovery for such debts.[11]

## V.

■ There remains the question of which of the conflicting interests here is entitled to enforce such claims as may exist for trademark infringement, a question not without its difficulties.

As I have indicated, the interventors do not assert any claims for trademark infringement and could not do so under the circumstances here. They claim that the trademark questions are moot and that therefore no decision need be made here on the question as to who is entitled to enforce such claims.

This may well be true with respect to the claim for injunctive relief for no cigars have been imported from Cuba by the defendant importers in the eleven pending actions since the cessation of trade with Cuba ordered by Presidential Proclamation 3447 in February 1962. But it cannot be said on this record that claims for damages for trademark infringements are necessarily moot or that the former owners of the Cuban entities are precluded for that reason from litigating such claims if they are entitled to do so.

I turn therefore to that question.

The interventors maintain that since a trademark is "not the subject of property except in connection with an existing business," Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 414, 36 S.Ct. 357, 361, 60 L.Ed. 713 (1916), the trademarks involved here should be deemed to have their situs in Cuba. In short, they urge that the situs of the good-will represented by a trademark must necessarily be the situs of the business that manufactures the product. See Callmann, Worldmarks and the Antitrust Law, 11 Vand.L.Rev. 515, 518 (1958). They say that therefore the trademarks were an integral part of the businesses in Cuba which were taken over by the Cuban decrees and that the court is thus proscribed by the act of state doctrine from questioning such takings.

However, this so-called indivisible unity theory with respect to trademarks such as these, registered in several countries, "seems to be abandoned," at least insofar as confiscations are concerned. Abel, Confiscation and Trademarks, 44 T.M.R. 1279 (1955). See also 3 Callmann, Unfair Competition and Trade Marks, 1339 and n. 68.1 (Supp.1965).

In Zwack v. Kraus Bros. & Co., 237 F. 2d 255 (2 Cir. 1956), it was squarely held that members of a confiscated Hungarian partnership could sue for monetary and injunctive relief against their former distributing agent in this country for infringement of trade names registered here. "[T]he Hungarian government

10. There is no occasion here to consider the so-called *Bernstein* exception to the act of state doctrine. Bernstein v. Van Heyghen Freres Societe Anonyme, 163 F.2d 246 (2 Cir.), cert. den., 332 U.S. 772, 68 S.Ct. 88, 92 L.Ed. 357 (1947); Bernstein v. N. V. Nederlandsche-Amerikaansche Stoomvaart-Maatschappij, 210 F.2d 375 (2 Cir. 1954) (per curiam). The Supreme Court did not pass on that exception in *Sabbatino*, 376 U.S. 419, 420, 84 S.Ct. 923. But in any event the *Bernstein* rule turns on representations by the Executive Branch of the government relieving the court from any constraint upon the exercise of its jurisdiction to pass on the question of the validity of the foreign confiscatory decrees. Here no such representations were made. Moreover, the position taken by the Executive Branch in *Sabbatino*, 376 U.S. at 420, 84 S.Ct. 923, and at the Congressional hearing on the Hickenlooper amendment, see Banco Nacional de Cuba v. Farr, 243 F.Supp. at 973, indicates that it would not make such representations here.

11. Of course, the fact that the interventors can sue in this country to recover the sums held by the various importers by no means answers the question of whether any money recovered can be removed to Cuba. See generally Sardino v. Federal Reserve Bank, 361 F.2d 106 (2 Cir. April 22, 1966) (Friendly, J.).

could not directly seize the assets which [had] a situs in the state of the forum," and the court would not permit such seizure indirectly "through confiscation of firm ownership" in Hungary. Id. at 259.

Similarly, in Baglin v. Cusenier Co., 221 U.S. 580, 31 S.Ct. 669, 55 L.Ed. 863 (1911), the Superior General of the Order of the Carthusian Monks was permitted to sue here to protect the trademark "Chartreuse" associated with that fine liqueur, even though the Order had been dissolved and its local property in France seized by the French Government:

> "We are not concerned with their authority under the French law to conduct this business, but it is not the business to which the trademarks in this country relate. Th..t business is being conducted according to the ancient process by the monks themselves. The French law cannot be conceived to have any extraterritorial effect to detach the trademarks in this country from the product of the monks, which they are still manufacturing." Id. at 596, 31 S.Ct. at 673.

With respect to trademarks registered abroad the French seizures were treated in similar fashion by the courts of several other nations. Adriaanse, Confiscation in Private International Law 45 n. 3 (1956); cf. Note, 53 Am.J. Int'l Law 687 (1959). And in Ingenohl v. Walter E. Olsen & Co., 273 U.S. 541, 47 S.Ct. 451, 71 L.Ed. 762 (1937), Justice Holmes, speaking for a unanimous Supreme Court, gave effect to a judgment of a British court which refused recognition to the American alien property custodian's transfer of exclusive rights to the use of a trademark in Honk Kong. He stated:

> "If the Alien Property Custodian purported to convey rights in English territory valid as against those whom the English law protects he exceeded the powers that were or could be given to him by the United States." Id. at 544, 47 S.Ct. at 452.

Roger & Gallet v. Janmarie, Inc., 245 F.2d 505, 45 CCPA 965, which upheld an assignment by a French manufacturer transferring ownership of a United States trademark, also supported the proposition that trademarks registered in this country are generally deemed to have a local identity—and situs—apart from the foreign manufacturer:

> "We think it is a mistake to assume that all of the goodwill symbolized by a trademark in international use has its situs at the place where the goods bearing the mark are made, at least to the extent of being so immobilized there as to preclude its original owner from parting with segments of it on a national basis. We are concerned here with business and goodwill attached to United States trademarks, not French trademark rights existing under French law. We take it as axiomatic that neither the trademark law of France nor of the United States has any extraterritorial effect. Where, then, can *business* done under United States trademarks, registered in the United States Patent Office, and the goodwill symbolized by them, have their situs except in the territory where United States law is enforceable? The location of the *owner* of such trademarks, the beneficiary of the goodwill attached to them, is an entirely different question and in this case the owner, until such time as he chooses to part with his United States rights, was unquestionably the French manufacturer, located in France. But, to our minds, what was being dealt with by the assignment in question was the business done in the United States under United States trademarks symbolizing goodwill in the United States. * * *. The legal concept of goodwill which we adopt must be in accord with business realities. We therefore hold that the situs of the goodwill of the business done under the 'Jean Marie Farina' trademarks in the United States was in the United States." 245 F.2d at 509–510. (Emphasis in original).

There is other authority for the view that United States trademarks of goods produced abroad may have a separate

legal existence apart from the foreign manufacturer. A. Bourjois & Co. v. Katzel, 260 U.S. 689, 43 S.Ct. 244, 67 L.Ed 464 (1923); Watson v. E. Leitz, Inc., 103 U.S.App.D.C. 74, 254 F.2d 777 (1958); Hoffman-LaRoche Chemical Works v. Morganstern & Co., 281 F. 923 (2 Cir. 1922), cert. den., 260 U.S. 729, 43 S.Ct. 92, 67 L.Ed. 485 (1922); see 15 U.S.C. §§ 1060, 1126(f). Compare State of Netherlands v. Federal Reserve Bank, 201 F.2d 455 (2 Cir. 1953); Capitol Records, Inc. v. Mercury Record Corp., 109 F.Supp. 330 (S.D.N.Y.1952), aff'd, 221 F.2d 657 (2 Cir. 1955). Moreover, trademark rights in this country cannot be affected by the decisions of foreign courts. Vanity Fair Mills, Inc. v. T. Eaton Co., 234 F.2d 633, 638–641 (2 Cir. 1956). This is because the "law of trade-marks rests upon the doctrine of nationality or territoriality * * *. The scope of protection is, therefore, determined by the law of the country in which protection is sought, and international agreements for the protection of industrial property are predicated upon the same principle." 3 Callmann, Unfair Competition and Trade-Marks, 1221 (2d ed. 1950).

Ultimately, since any attempt to assign a situs to an intangible such as a trademark "is in truth a legal fiction," Severnoe Securities Corp. v. London & Lancashire Ins. Co., 255 N.Y. 120, 123, 174 N.E. 299, 300 (1931), the effect of the confiscatory Cuban interventions may best be evaluated by determining whether recognition of a transfer of title to trademarks registered in the United States would give an impermissible extraterritorial effect to the takings.[12]

Under this view, as the case law suggests, the interventors are not entitled to enforce in our courts claims arising out of property rights represented by trademarks registered with the United States Patent Office. Though the cigars they sold here were the genuine products of the Cuban businesses, this would "not necessarily carry the right to sell them at all in a given place." A. Bourjois & Co. v. Katzel, 260 U.S. 689, 43 S.Ct. 244, 245 (1923).

The facts stipulated in this case indicate that the former owners have continued to carry on some business in this country in the names of the plaintiff entities and have taken prompt steps to enforce any trademark rights they might have. The confiscation of the Cuban properties certainly could not extinguish their rights to conduct this business here in the names of the confiscated entities. Otherwise, extraterritorial effect would be given to the decrees of confiscation in this country, an impermissible result patently contrary to United States policy and laws. For example, assuming no interruption in trade, the interventors by reason of the confiscatory decrees would then succeed to the good-will established in this country through years of efforts by the Cuban entities under the direction and control of the former owners. Similarly, the former owners through the loss of their trademarks would be forever foreclosed from the benefits accruing from the good name of their products.

The rights of the former owners to conduct their businesses here include the right to make use of the good-will long established in this country of which the trademarks are an integral part. These trademark rights cannot be "detached" from the good-will and the right to conduct the businesses by giving impermissible extraterritorial effect to the Cuban decrees through a holding that the inter-

---

12. It has been said that "a disguised application of public policy may be involved in the court's treatment of an expropriation of intangible property, which has an ascribed rather than a physical situs. In such cases the court may strain to find that the property has a situs outside the taking state, and thus to avoid application of the foreign law, even if the [contacts] with some other jurisdiction are relatively slight." Collinson, Sabbatino: A Treatment of International Law in United States Courts, 3 Colum.J.Transnat'l L. 27, 35 (1964), citing, inter alia, Central Hanover Bank & Trust Co. v. Siemens & Halske Aktiengesellschaft, 15 F.Supp. 927 (S.D. N.Y.), aff'd per curiam, 84 F.2d 993 (2 Cir.), cert. den., 299 U.S. 585, 57 S.Ct. 110, 81 L.Ed. 431 (1936).

ventors rather than the former owners are entitled to enforce claims for infringement.[13]

Once it is determined that the interventors are excluded from enforcing trademark claims the problem becomes relatively simple.

The *Zwack, Ingenohl* and *Baglin* cases are not, as the interventors urge, distinguishable on the ground that the manufacturers of the confiscated trademarked goods continued to conduct their businesses elsewhere. The mere fact that the taking has been so complete as to impose substantial barriers to the resumption of business by the former owners does not establish that they are without right to do so. Indeed, as Judge Palmieri suggested in *Zwack* the continued importation of cigars bearing the names of the Cuban entities and the trademarks may have been the "direct cause of the plaintiffs' inability to arrange for [their] manufacture * * * in this country since those who would be otherwise prepared to furnish financial backing are unwilling to do so because of the probability of 'buying a lawsuit'." 133 F. Supp. at 933.

There has been no claim that the former owners have abandoned the trademarks. Nor could such claim prevail. As was said in Baglin v. Cusenier Co., 221 U.S. 580, 597–598, 31 S.Ct. 669, 674 (1911):

"the loss of the right of property in trademarks upon the ground of abandonment is not to be viewed as a penalty either for nonuser or for the creation and use of new devices. There

must be found an *intent* to abandon, or the property is not lost; and while, of course, as in other cases, intent may be inferred when the facts are shown, yet the facts must be adequate to support the finding." (Emphasis in original.)

The prompt assertion by the former owners of claims for infringement of the trademarks of the Cuban entities involved here effectively negates any intention to abandon them. Baglin v. Cusenier Co., supra at 598–599, 31 S.Ct. 669; cf. Korona Spice Corp. v. Kuczor, 77 U.S.P.Q. 172, 173 (Comm'r 1948); Sherwood Co. v. Sherwood Distilling Co., 177 Md. 455, 9 A.2d 842 (1939).

However, the question of whether or not the former owners of the Cuban entities have the right to enforce these claims necessarily involves issues of fact. There may be additional proof available from the former owners and the interventors bearing on the question, and I am not prepared finally to resolve it on the rather limited record before me. The question should be raised and determined in the actions now pending in this court against the importers of the Cuban cigars in which the ultimate issues of infringement will be litigated.

The interventors are therefore excluded from enforcing any claims for trademark infringement in the pending actions. The former owners through their attorneys Messrs. Brush & Bloch, the defendants in this action, may continue as parties in those pending actions for the limited purpose only of pursuing the claims for trademark infringement.[14]

---

13. The only authority cited by the interventors in support of its indivisible unity theory is Societe Vinicole de Champagne v. Mumm Champagne & Importation Co., 10 F.Supp. 289, 13 F.Supp. 575 (S.D. N.Y.1935). The case, however, has twice been distinguished on grounds not entirely satisfactory, E. Leitz, Inc. v. Watson, 152 F.Supp. 631, 636 (D.D.C.1957), aff'd, 103 U.S.App.D.C. 74, 254 F.2d 777 (1958); Zwack v. Kraus Bros., 133 F. Supp. 929, 935 (S.D.N.Y.), aff'd, 237 F.2d 255, 261 (2 Cir. 1956), and otherwise has demonstrated no generative in-

fluence. Indeed, *Mumm Champagne's* consideration of the site of the factory as decisive has been criticized as "neglecting other factors such as advertising, merchandizing and the previous existence of a separate sales agency." Casenote, 36 Colum.L.Rev. 163, 164 (1936).

14. Under similar circumstances our courts have endowed "extraterritorial immortality" upon the "fugitive ghost" of a corporation which had been liquidated in its domicile. M. Salimoff & Co. v. Standard Oil Co., 262 N.Y. 220, 226, 186 N.E.

The defendant importers in the pending actions will of course be free to raise in defense all matters bearing both on the rights of the former owners·to enforce such claims and the ultimate questions of infringement.

*Conclusion*

Since the decision here will result in placing the eleven pending actions against the importers of Cuban cigars in a somewhat confused posture, it will be well to summarize my holdings and to discuss briefly their effect on the pending actions.

I hold:

(1) that the interventors through attorneys of their own choice are entitled to pursue the claims for debts due from the importers of Cuban cigars which are involved in the eleven pending actions in this court and the former owners are not;

(2) that the former owners may pursue the claims for trademark infringement involved in the pending actions and the interventors may not. The leave given to the former owners to pursue such claims is not to be construed as a definitive holding that they are in·fact the owners of the trademarks or are entitled to rights thereunder. That issue will remain to be litigated and finally determined in the pending actions along with questions of infringement.

Since the importers who are defendants in the pending actions are not parties to this action and have not been heard, the decision is confined to rights as between the interventors on the one hand and the former owners on the other. The decision does not preclude the defendant importers from raising and litigating in the pending actions any issues they may choose to raise between themselves and the respective interventors and former owners.

In the nine pending actions in which it is claimed that cigars shipped have not been paid for, there will be two parties plaintiff represented by two sets of attorneys—the interventors represented by Messrs. Rabinowitz & Boudin asserting claims for debts due for cigars shipped by the interventors and the former owners represented by Messrs. Brush & Bloch asserting claims for trademark infringement.

Plainly such technical adjustments in the present posture of the actions as may be necessary to carry out my decision here will have to be made, including changes in parties and appropriate pleadings, perhaps including assertion of setoffs by the defendant importers against any debts found to be due in the event that they are found to have incurred any liability for trademark infringement. These adjustments can be made by appropriate motions in the pending actions.

The two pending actions against the R. C. Wood defendants will be in a somewhat different posture though technical adjustments will be necessary there likewise. Since the interventors do not claim that there are any debts due from the defendant importers in these actions for cigars shipped, and moreover are represented by Messrs. Rabinowitz & Boudin who also represent the defendant importers, it would appear as if the debt claims will be appropriately disposed of. There will remain the claims for trademark infringement on which the former owners will be represented by Messrs. Brush & Bloch, with Messrs. Rabinowitz & Boudin representing the defendants. The appropriate adjustments in these actions may be made by motions also.

Such adjustments as may be necessary in the various actions should be relatively easy to accomplish through stipulations or other shortcuts since all these actions are assigned to me for all purposes under Rule 2 of the General Rules of this court.

The respective motions in the case at bar are granted to the extent indicated in this opinion. Judgment will be granted accordingly and will be settled on notice.

It is so ordered.

679, 682 (1933). This would be so *a fortiori* with respect to corporations such as these whose corporate exist-

ence has not been entirely obliterated by the Cuban government which created them.